YOUNGER B. DENNY, Executor of the Estate of JOSIAH C. WOLCOTT, Appellant, v. MARGARET A. GUYTON, FANNIE G. CARKENER, J. FRANK GUYTON, Executors of the Will of J. D. GUYTON; COMMERCE TRUST COMPANY, a Corporation, Executor of the Will of H. M. BEERS; W. R. HARRINGTON,

YOUNGER B. DENNY, Executor of the Will of JOSIAH C. WOLCOTT, v. MARGARET A. GUYTON, FANNIE G. CARKENER, J. FRANK GUYTON, Executors of the Will of J. D. GUYTON; COMMERCE TRUST COMPANY, a Corporation, Executor of the Will of H. M. BEERS; W. R. HARRINGTON, Appellants.—57 S. W. (2d) 415.

Court en Banc, December 31, 1932.

*James A. Reed, J. M. Johnson, I. N. Watson, J. P. Aylward, Donald W. Johnson, Henri L. Warren* and *John B. Gage* for appellant-respondent.

1120

*R. R. Brewster, George L. Edwards, Ryland, Stinson, Mag & Thompson* and *Madden, Freeman & Madden* for respondents-appellants.

WHITE, J.—A second appeal. Suit was begun in the Circuit Court of Jackson County by Josiah C. Wolcott against J. D. Guyton, H. M. Beers and W. R. Harrington, and the administrator of J. M. Grant. Wolcott died before the trial and the suit progressed in the name of his executor. After trial, while the case was pending

on appeal, J. D. Guyton and H. M. Beers died and the cause was revived against the executors of each.

On the first trial there was a judgment for plaintiff which, on motion of defendants, was set aside and new trial granted. The first appeal was from that order. On a hearing the first opinion of this court affirmed the judgment. After a motion for rehearing was filed this court ordered a reargument of the case. Defendants find occasion to assign error on account of that action.

The reargument was followed by an opinion reversing the judgment and remanding with directions. [327 Mo. 1030, 40 S. W. (2d) 562.]

The issues are stated and the facts considered at length in the opinion there. It was alleged that Wolcott, Guyton, Beers, Harrington and Grant, being extensively engaged in the buying and selling of horses and mules at Kansas City, Missouri, and other places, conducted their enterprise through certain corporations in which they were stockholders, directors and officers; that the five men in September, 1914, for the convenient handling of the business of their several corporations entered into a verbal contract to engage in a joint adventure in the buying and selling of horses and mules to the British Government and other belligerent countries, and agreed that all the business conducted by two principal corporations, the Guyton & Harrington Mule Company and the Stock Yards Horse & Mule Company, by subsidiary corporations and by the individuals as partnerships under trade names in the United States and foreign countries should be included in the joint adventure and the profits divided between the five men in proportion to the ownership of stock by said parties in the Stock Yards Horse & Mule Company, approximately one-fourth each to Guyton and Harrington, and one-sixth each to Beers, Grant and Wolcott.

That the business conducted by the several parties and their corporations consisted of buying throughout the United States horses and mules and selling them mainly to the British Government during the World War; that in March 1916, Wolcott being in ill health sold and transferred to J. D. Guyton his interest in the business; that he was induced to make such sale by fraudulent representations and concealments made by defendants regarding the condition and profits of the business.

The suit is in equity to set aside that sale and transfer of Wolcott's interest and for an accounting on the part of defendants for the profits actually accrued to the parties in their joint adventure. The issues are set out specifically and in detail in the opinion reported. [327 Mo. 1030, 40 S. W. (2d) 565-6.] It was held that the findings of the trial court—that there was such joint adventure agreement as alleged and that Wolcott's interest in the business was

procured by fraudulent representations—were sustained by the weight of evidence, but that in the matter of accounting the evidence was unsatisfactory. The judgment was reversed and cause remanded with directions to take an accounting of the profits of the business only.

The case went to trial a second time in the circuit court on an amended petition upon which the first trial was had; the defendants filed a second amended answer which is of great length and largely argumentative, setting up additional defenses to the claim of joint adventure and the claim of fraud. These defenses whether or not tendering issues not available under the general denial upon which the case was first tried are urged by defendants as proper claims upon our attention.

The trial court overruled the motion of the plaintiff to strike out the allegations of new matter in the amended answer and admitted the evidence upon it including all the evidence preserved in the abstracts of the record from the first trial. Afterwards, on plaintiff's motion, the court struck out all that evidence except that relating to the accounting, refused to consider again the questions of joint adventure and fraud, took an accounting and rendered judgment in favor of the plaintiff, found that at the conclusion of the joint adventure, February 21, 1918, the defendants owed the plaintiff $665,952.76 which, with interest at six per cent to the date of judgment June 2, 1932, amounted to $1,236,488.48 and adjudged that plaintiff recover that sum.

The plaintiff, asserting that the judgment should have been for more, appealed, Case No. 32,372, and the defendants, asserting that it should be less, if any, appealed, Case No. 32,373. The two appeals are consolidated in this court.

■ I. It is first claimed by defendants that this court had no authority to vacate the first opinion which affirmed the order of the trial court after the first trial granting a new trial. A motion for rehearing filed here was not overruled; the minutes of this court recite that a reargument was ordered because three of the judges concurring in the first opinion withdrew their concurrences. The argument now seems to imply that the proceeding was something unusual in the disposition of cases in this court. When the first opinion affirming the original judgment was handed down, the minutes show, one judge was absent, one judge did not sit, leaving only five judges, including the writer of that opinion, concurring. The motion for rehearing filed by plaintiff apparently convinced three of the judges that the first opinion was wrong. But the three judges, a minority, could not sustain the motion for rehearing, and the two judges concurring in the original opinion could not overrule it. The

three judges who had come to believe the first opinion was erroneous were entirely within their rights in withdrawing their concurrences. That left the case open and under submission. It did not render this court impotent to act nor leave the case perpetually hung up pending a motion for rehearing which could not be acted upon. That justice might be done a reargument was ordered. There is nothing unusual in the procedure. When the case was reargued the personnel of the court had changed somewhat. The point is without merit.

II. Defendants argue that when the cause was remanded all of the issues before the trial court in the first trial and before this court on the first appeal were open for reexamination of the second trial: (1) the question of the existence of the alleged joint adventure; (2) the question of fraud in the procurement of Wolcott's transfer of his interest; and (3) the question of accounting. The trial court concluded that it was limited to the accounting by the directions of the court in remanding the case. The conclusion of the court and the directions in the reversal, 327 Mo. 1030, 40 S. W. (2d) l. c. 591, were as follows:

"We see no occasion for a new trial on the issues of joint adventure agreement and fraud. It follows that the successor judge erred in sustaining defendants' motion for a new trial of the whole cause. However, upon the evidence now before us we cannot intelligently review alleged errors as to the accounting or finally dispose of that issue ourselves by entering the proper judgment. In such case the cause should be remanded for a new trial on that issue only. (Citing cases.)

"It is therefore ordered that the order of the successor judge granting a new trial be reversed, and that the cause be remanded for such further proceedings as may be necessary to determine the issue of accounting only, and upon the completion thereof that proper judgment be entered by the trial court in accordance with our findings hereinabove stated on other issues and in accordance with the facts then found on this issue."

Defendants' argument brings into consideration "the law of the case" which controls subsequent proceedings. The general rule is that the decision of an appellate court is the law of the case on all points presented throughout all subsequent proceedings both in the trial and the appellate courts, and no question involved and decided in the first appeal will be considered on a second appeal. [4 C. J. 1093-1100.] The notes to that general statement cite cases from all states and include nearly all the cases cited by defendants from this court. The application of this rule is sometimes stated as *res adjudicata* and sometimes is termed *stare decisis*. Strictly, it is not *stare decisis*, which means a principle of law which has been applied to a similar state of facts so as to become a rule of property. [Lumber Company v. Craig, 248 Mo. 331; 15 C. J. p. 919.]

Defendants argue that the ruling on the first appeal cannot be *res adjudicata* here because there can be *res adjudicata* only in case of final judgment upon the merits of the case, and in this case there was no final judgment except the one which was set aside in sustaining the motion for new trial in the first instance; that this court did not and could not render a final judgment because three propositions were required to be proved: the joint adventure, the fraud, and the amount due on accounting. As long as the last was uncertain and had to be considered there was no final judgment and could be no final judgment; therefore there was no *res adjudicata.* But the doctrine that final judgment must be rendered before *res adjudicata* can be asserted has no application to a situation like this. ■ True, ''the law of the case,'' while sometimes spoken of as *res adjudicata* is not strictly such. [4 C. J. 1097.] In Mangold v. Bacon, 237 Mo. 517, 141 S. W. 650, it was said:

''We have used the strong term, '*res adjudicata*', in cases in connection with the general rule. Possibly the use of the term is a little due to poverty of our language in expressing nice shades of thought, or by way of analogy. However that be, the exceptions to the rule show the term *res adjudicata*, in all its strictness, is an inappropriate or loose expression in that connection. It would be better to say 'in the nature of *res adjudicata.*' ''

The Mangold case occupies a large space in defendants' argument. The statement of Judge LAMM quoted is correct. Defendants concede that ''the law of the case'' as stated on former appeal is in effect *res adjudicata* with exceptions. It will be noted here that those exceptions apply to cases where a rule of law is applied to the facts in the case and there has been a general reversal and remand, not where the remand is with specific directions.

■ Defendants further say that there can be no remand with direction which limits the investigation of a trial court except directions which require only ministerial actions; that no remand with directions to the trial court to exercise its judicial functions could limit that discretion in any particular in the case. As to that proposition it will be found in numerous cases, some of them cited by the defendants, that a remand with directions to perform a judicial act, undetermined on the former appeal, are binding upon the trial court and upon this court on a subsequent appeal.

■ Defendants assert the ''law of the case'' is a rule of convenience. A passage in the Mangold opinion possibly gave rise to this contention, 237 Mo. l. c. 512-513, 141 S. W. 650, where it says that the legal conclusions announced on the first appeal prescribe the duty and limit the power of the trial court, ''become and remain the law of the case in all after steps below or above on subsequent appeal. The rule is grounded on *convenience, experience* and *reason.* Without the rule

there would be no end of criticism, reagitation, re-examination and reformulation. In short, there would be endless litigation.''

That statement is far from saying that the rule is a rule of convenience. Justice cannot be administered as a matter of convenience. It is grounded on convenience, experience and *reason*. Convenience and experience come in only as describing the method of arriving at the reason. There must be an end of litigation. The principle is not a rule of convenience, but it is a principle of justice, so recognized, like the Statute of Limitations. Defendants base their argument upon exceptions to the rule of ''the law of the case'' stated in the opinion in the Mangold case, which will be noted. Such exceptions as we will explain do not apply to reversal and remand with specific direction.

III. The remand in this case was with specific directions. The court said, 327 Mo. 1030, 40 S. W. (2d) l. c. 591:

''The case should be remanded for new trial *upon that issue only.*'' (The issue of accounting.)

Then follows the order:

''That the cause be remanded for such further proceedings as may be necessary to determine the issue of accounting only, and upon the completion thereof that proper judgment be entered by the trial court *in accordance with our findings hereinbefore stated on other issues* and in accordance with the facts then found on this issue.''

On defendants' theory these specific directions have no effect, the case is open for determination here upon the very issues concluded by that ruling and those directions have no more force on a second appeal than a mere reversal and a general remand.

It has been uniformly held by this court that where a cause is remanded with specific directions it is out of the power of the lower court to open the cause and have a new trial on issues determined in the opinion. This court will reverse the judgment where the trial court refused to allow such directions. [Chouteau v. Allen, 74 Mo. 59; Shroyer v. Nickell, 67 Mo. 589; Murphy v. Barron, 286 Mo. l. c. 401, 228 S. W. 492; Keaton v. Jorndt, 259 Mo. 190; 168 S. W. 734; Stump v. Hornback, 109 Mo. 272. l. c. 277. 18 S. W. 37; Hecker v. Bleish, 327 Mo. 377, 37 S. W. (2d) 444, l. c. 447; McLure v. Bank, 263 Mo. 128, 172 S. W. 336; First National Bank v. Franklin Bank, 233 S. W. 11, l. c. 13.] The position of defendants presents an anomalous situation. They admit that the trial court must follow specific directions such as set out in this case in the former opinion, but, they argue, this court can discard such former ruling. Therefore we are asked to reverse the judgment of the trial court, not because it has *erred*, but because it has *not* erred.

Defendants put this upon the ground that this court may correct its own errors. That is equivalent to saying that a determination of

this case upon second appeal is the same as considering a motion for rehearing. A motion for rehearing was filed after the former opinion was handed down, considered in all its phases and overruled. It raised every point that most ingenious counsel could conceive.

The defendants argue at length that the exceptions to the *res adjudicata* rule applies as well to a case remanded with specific directions as to one remanded generally.

In Murphy v. Barron, 286 Mo. 390, 228 S. W. 492, this court distinguished a case where there are specific directions, like that in McLure v. Bank, 263 Mo. l. c. 136, 172 S. W. 336, and said l. c. 401:

"Those cases deal with the effect of the reversal of a judgment and remandment of a cause with specific directions to the trial court as to the judgment to be entered or *the course to be pursued.* In such cases it becomes the duty of the trial court to do the things directed. The 'mandate is in the nature of a special power of attorney.'" (Italics ours.)

Then we pointed out that there was no difference between a simple reversal and remand and the use of the additional words, "for further proceedings in accordance with this opinion." Such words add nothing to what is implied in a general reversal and remand. "The law of the case" applies where a general principle of law is declared as applicable to the facts of the case. If it is remanded generally all issues are open to consideration on a new trial. The pleadings may be amended or new and controlling facts produced. Often a second appeal presents a totally different case from that appearing on the first appeal. In all cases of general reversal, whether different issues and different evidence appears in the second trial or not, this court, upon a second appeal, if convinced that it has, on the first appeal announced a rule out of harmony with our former rulings or has been mistaken as to some controlling fact (not in the weight of the evidence), may overrule its pronouncement in the former appeal. These are exceptions to the rule which defendants would apply on this appeal.

A statement of the law as applied to the facts in the cause is one thing and a determination of the *issues* tendered in the cause is another thing. Where a case is reversed and remanded with specific directions to try certain issues *only*, all other issues are determined on the first appeal. In general reversal and remand the court states a *rule* for further proceeding on the issues joined. Where the reversal is with specific directions as to certain issues, *other isssues determined* are foreclosed to further inquiry. The first states "the law of the case," the second is *res adjudicata* final. The latter is not an exception to the exceptions, but a variation of the original rule which admits of no exceptions such as apply to a general reversal and remand. An examination of the cases shows how this court has construed the effect of reversal and remand with specific directions. [Mc-

Lure v. Bank, 263 Mo. 128, 172 S. W. 336; Hecker v. Bleish, 327 Mo. 377, 37 S. W. (2d) 444; Stump v. Hornback, 109 Mo. 272, 18 S. W. 37; Shroyer v. Nickell, 67 Mo. 589; Chouteau v. Allen, 74 Mo. l. c. 59; Young v. Thrasher, 123 Mo. 308, 27 S. W. 326; Keaton v. Jorndt, 259 Mo. 190, 168 S. W. 734; Rees v. McDaniel, 131 Mo. l. c. 682, 33 S. W. 178.]

The McLure case was for an accounting. On the first, appeal, 252 Mo. l. c. 524, 160 S. W. 1005, the judgment was reversed and the cause remanded with specific directions, as follows:

"A majority of the court, however, are of the opinion that the cause should be remanded to the end that the issue of the value of the land may be more thoroughly tried, and the whole court is of the further opinion that the new trial should be confined to that single issue, all other issues having been properly tried and determined before. Either party may so amend the pleadings, if such is desired, so as to clearly draw the issue upon this question."

That is in effect exactly the same as the reversal and remand in this case. On the second trial the defendant sought to amend its answer by setting up a plea of estoppel on the merits. The trial court refused to permit amendment. On the second appeal this court said, l. c. 136:

"The issue of estoppel . . . being an issue upon the merits, went out of this case upon the rendition of the former judgment here. For we reversed and remanded this case *with directions*. Thereby all other matters were concluded by our judgment except the single one set out in those directions."

Citing a number of earlier cases noted above.

This court in remanding *this* case cited the McLure case and other cases cited in that case, and made the order quoted above. Clearly it was the intention of this court in remanding the case for the purpose mentioned to follow the procedure laid down in those cases.

In Hecker v. Bleish, 327 Mo. 377, 37 S. W. (2d) 447, this court followed that rule and quoted that language of the McLure case, that all matters were concluded in the former appeal, "and, having become *res adjudicata* cannot be reopened on this appeal."

In Stump v. Hornback, 109 Mo. l. c. 277, 18 S. W. 37, after stating that the directions to enter particular judgment on the former appeal the trial court had no power to enter any other or to consider or determine any other matter, and added:

"All other matters become *res adjudicata,* and could not be reopened."

That case was cited in the McLure case and the Hecker case. Similar positive expressions by this court in Chouteau v. Allen, 74 Mo. l. c. 59, where it is said to be

"out of the power of the lower court to open the cause and have a new trial."

Shroyer v. Nickell, supra, was an action in ejectment. On the first appeal, 55 Mo. l. c. 270, all issues as to the plaintiff's right to recover were settled and the cause was reversed and remanded for the purpose of taking account of the rents and profits and the value of the improvements. On the second appeal the court said, 67 Mo. l. c. 590, that the trial court followed the directions, and commented:

"All this was in conformity to our directions, and under those directions the plaintiff was not entitled to open the case and have a new trial."

These earlier cases mentioned establish the rule of *res adjudicata,* followed in the later cases cited, by the determination of the issues on a former appeal, and have been followed in the later cases cited. That very distinction from a general remand has been pointed out in Murphy v. Barron, supra, 286 Mo. l. c. 401, 222 S. W. 492, where it was said, quoting the Chouteau case and the Stump case:

"In case directions are given it is its (the trial court's) duty 'to do those things and those things only which it is directed to do by the mandate contained in the judgment.' "

In Keaton v. Jorndt, 259 Mo. l. c. 190, 168 S. W. 734, the same expression is used.

Since this case is of great importance and the defendants have argued it with great earnestness and evidence of extensive research, it is necessary to notice the cases upon which they rely for the claim that there is no difference between a general reversal and a reversal with specific directions as to the power of this court upon a second appeal to overrule what is said in a former appeal.

In Mangold v. Bacon, cited by defendants on the first appeal, 229 Mo. l. c. 482, 130 S. W. 23, the case was reversed and remanded, "to be further proceeded with in accordance with the views in this opinion expressed."

A general reversal and remand. On a second appeal the court said, 237 Mo. l. c. 513, 141 S. W. 650, after stating the general rule regarding *res adjudicata* on second appeals, "there are exceptions to the rule as well recognized as the rule itself," citing a number of cases. In each of the other cases cited, the former appeal was a general reversal with no specific directions. The exceptions are where a controlling fact has been overlooked, or where this court sees fit to change a general rule of law. In Bird v. Sellers, 122 Mo. 23, l. c. 33, 26 S. W. 668, there was a general reversal and remand on the first appeal, 113 Mo. l. c. 595, 21 S. W. 91.

In Gracey v. St. Louis, 213 Mo. l. c. 401, the cause was reversed and remanded with directions to set aside a nonsuit and proceed with the case "in accordance with this opinion,"—a general reversal and remand. This court said on the second appeal, 221 Mo. l. c. 6, 119 S. W. 949, that the rule of *res adjudicata* in regard to a finding on the first appeal had its exceptions:

"Where manifest and far-reaching error has been committed, no cast-iron or immutable rule bars a re-examination of a question," so far as the *rule of law* announced in such case.

Bealey v. Smith, 158 Mo. l. c. 523, 59 S. W. 984, is along the same line.

Taking later cases, defendants cite Davidson v. Railroad, 301 Mo. 79, 256 S. W. 169. On the first appeal, 229 S. W. 786, l. c. 790, the case was reversed and remanded because the trial court erred in refusing a peremptory instruction asked by the defendant and the case was remanded "for further proceeding in accordance with the views expressed in this opinion." On second appeal, 301 Mo. l. c. 85, 256 S. W. 169, it was said:

"It should be further stated, however, that even if there is no substantial difference in pleadings and proof upon the re-trial, yet if this court upon second appeal finds that it was in error upon the first hearing, it not only has the power and right to correct such error, but it would be the duty of the court so to do, in the interest of justice. This is true whether we erred in the *principles of law declared,* or erred in determination of what were the *real facts of the case.*" Citing the Mangold case. (Italics ours).

There were no specific directions and on this second hearing, l. c. 87, the court *affirmed* the judgment of the trial court and *made no change* in its former ruling.

In United Shoe Machinery Company v. Ramlose, on the first appeal, 201 Mo. l. c. 656, 109 S. W. 567, the judgment was reversed and remanded with directions to cause issues to be framed as to certain matters, the case to be tried in accordance with such issues and upon such trial to render judgment against the plaintiff. On the second appeal, 231 Mo. l. c. 527, 132 S. W. 1133, the court said:

"That rule, however, is not, strictly speaking, controlling in the case at bar (that is the rule in regard to reverse and remand to proceed in accordance with the former opinion), for the reason that the questions chiefly relied upon on this appeal for a reversal of the judgment are Federal questions, and were not presented to the court for determination on the former appeal. In fact, appellant had no opportunity to present them until the circuit court gave, at the beginning of the second trial, the instruction framing the issues to be determined by the jury, as directed by this court."

Plainly on the first appeal the court directed an amendment of the pleadings to present certain new issues. Those very issues permitted a question to be introduced not presented or determined on the first appeal. Consequently, while the directions on the first appeal were in a sense specific they were quite general as to the scope which was permitted to the trial court. It permitted a new question to be brought into the case. So it was not a case with limited specific directions.

First National Bank v. Franklin Bank is cited, 233 S. W. 11. The judgment on the first appeal, (211 S. W. 8), was reversed and the cause remanded with directions to take an accounting, other issues having been determined. The court said, l. c. 13, that the judgment on retrial should be affirmed. "It was entered in strict conformity with our directions, and the trial court cannot depart from our directions." Quoting the Keaton case and the Stump case, supra, but the court added:

"Of course this court has the right to change its views upon questions involved in a former appeal, and perhaps in this way void its own directions, but in this case we have no desire to change our former ruling."

That *dictum* was *obiter* and had nothing to do with the determination of the case for this court affirmed the judgment of the circuit court which followed the directions given on the first appeal.

In State ex rel. Dolman v. Dickey, 288 Mo. 92, 231 S. W. 582, the court said in regard to the first appeal, l. c. 99:

"We remanded the original case, at the instance and request of relator, in order to give him a chance to recover on tax bills for the *curbing and sidewalk,* if the trial court should find that the contract was severable, etc. The *jurisdiction* of the circuit court upon a retrial of the case, was *limited* solely to the above *issue.* In granting relator's request for a retrial of the above matter, it was upon the theory, that the petition and writ were to be *considered* as amended, so as to deal *alone* with the above issue."

The case was tried on the amended petition as directed and the judgment was affirmed. We fail to see anything in that case which supports the defendant's contention. On the contrary, it is against that contention.

In Citizens' Bank v. Donnell, 195 Mo. 564, 94 S. W. 516, the trial court followed the directions on the first appeal and on a second appeal the judgment was affirmed. The court, however, said l. c. 571:

"It is true there are exceptions to this rule (that is, that the law announced on the first appeal becomes the law of the case), but cogent and convincing reasons must exist to induce a re-opening, on the second, of questions decided on a former appeal."

The opinion does not state what those questions are nor the scope of such reopening. What it said is entirely *obiter* and had nothing to do with the decision of the case, because the trial court followed the direction on the first appeal and the judgment was affirmed.

Thus in every case cited by defendants, with exception of the Franklin Bank case, 233 S. W. 11, and the Citizens' Bank case, 195 Mo. 564, 94 S. W. 516, is where the question came up on the second appeal, the reversal and remand on the first appeal was general,

with issues still open for determination. The Franklin Bank case and the Citizens' Bank case were reversed and remanded with specific directions which *were* *followed* and the second judgment in each case was *affirmed,* and statements in the opinions regarding exceptions to the rule of *res adjudicata* were *obiter.* In every other case which has come to this court, so far as we can find, where specific directions were given on the first appeal it has been held on a second appeal that the specific directions must be followed.

■ In the appeal here there is no escaping the clearness of the specific directions. The defendants quote from the mandate which says that the cause is "hereby remanded to the Circuit Court of Jackson County for further proceedings to be had herein in conformity with the opinion of this court therein delivered," seeking to divorce the opinion from the mandate, whereas the mandate must include the opinion. The proceeding could not be in accordance with the opinion without following the opinion's directions. This court could not affirm the judgment of the trial court which was held to be right on the issues of joint adventure and fraud, because the trial court had set aside that judgment. All this court could do was to reverse the order setting aside that judgment. Had the issue of accounting been determined by the trial court this court would have ordered the judgment reinstated. Since there could be only one judgment it was necessary to try that one issue of accounting and then enter judgment "in accordance with our findings hereinabove stated on other issues and in accordance with the facts then found on this issue,"—of accounting. The trial court followed that order. It could not do otherwise. It would have been in error if it had not followed it. The authorities are so uniform that we are not at liberty to depart from the rule announced. The questions determined on first appeal are foreclosed and could not be opened on the second appeal. It was not merely a statement of the law of the case which would prevail on a subsequent trial of the same issues, it was the final determination of those issues.

■ IV. The original answer filed by the defendants was a general denial, certain specific denials, and a plea of the Statute of Limitations. Before the last trial defendants filed an amended answer. So far as it can be said to present new defenses on the issues of the joint adventure and fraud, such defenses are concluded by the opinion on the first appeal. The finality of the court's determination upon those issues is particularly appropriate here. The merits of this case have been thrice argued at great length before this court. Elaborate briefs and arguments were presented for consideration on each submission. Every point which appellants seek to inject into this case on those issues, determined by the former opinion, was presented with great force and skill and at great length

in support of the motion for rehearing so that this court not only has had an opportunity to consider but has considered every point now urged for re-examination of those issues.

There must be an end of a law suit. The only matters for consideration by the trial court was the matter of accounting, and that is the only matter for our consideration.

## THE ACCOUNTING.

V. The plaintiff employed an accountant to examine the books affecting the transactions of the Guyton & Harrington Mule Company, the Stock Yards Horse & Mule Company, and subsidiary agencies. That accountant made his report on all the books and accounts available for his inspection. Some books and papers had been destroyed or lost. Defendants likewise employed. an accountant to examine the books and make a report. These separate investigations produced widely different results.

The plaintiff's accountant found that the balance due Wolcott's representative, February 21, 1918, was $848,634.28.

The defendants' accountant found the amount at that date to be $286,602.80.

There was no important disagreement as to what the books actually showed. The difference arises in the allocation and the effect of several items, and in deductions from the profits of the business. The trial court reached its own conclusion from those items, allowing some of the claims of each and in his final summary, which we will call Summary A. found the profits of the business of the two corporations, with deductions and final amount due the Wolcott interest at the date mentioned, as follows:

### SUMMARY A.

COURT'S SUMMARY AND COMPUTATION OF AMOUNT DUE J. C. WOLCOTT
ON THE BASIS OF JOINT ADVENTURE

| | | | |
|---|---|---|---|
| Net profits of the Guyton & Harrington Mule Company | | | $3,235,569.48 |
| Net profit of the Stock Yards Horse & Mule Company | | | 3,262,972.16 |
| | | | $6,498,541.64 |
| DEDUCTIONS: | | | |
| Legal fees in Thompson-Roberts case | $ 10,000.00 | (22) | |
| Payment made in settlement of Thompson-Roberts case | 50,000.00 | (22) | |
| Legal fees in Wisler case | 10,000.00 | (22) | 70,000.00 |
| Total | | | $6,428,541.64 |
| J. C. Wolcott's interest on basis of 165-1/3/1000 of this amount | $1,062,852.22 | | |
| 1/6 of Capital Stock of Womack & Stroud Mule Co. | 1,666.67 | | |
| Interest on Guyton & Harrington distribution, 292 days | 22,167.78 | (See Ptf's summary) | |
| Interest on Stock Yards Co., distribution, 268 days | 16,128.63 | | |
| Interest on Stock Yards Co., distribution 7-13-17, 222 days | 5,201.15 | | |
| Interest on remaining share in distribution of additional working capital ($1,504.78), 667 days | 164.75 | (15) | |
| Interest on share of capital stock in Womack & Stroud Mule Co., 250 days | 68.49 | | |
| Interest on Womack & Stroud Co., profits, distributed 6-15-17, 250 days | 1,869.75 | | |
| | $1,110,119.44 | | |

PERSONAL DEDUCTIONS:

| | |
|---|---:|
| Paid on contract of March 1, 1916 | $ 340,000.00 |
| *Commission on sale of E. St. Louis real estate | 55,644.45 |
| Interest on E. St. Louis Real Estate commission | 2,936.99 |
| Interest on $340,000 to 2-21-18 | 40,296.98 |
| Interest on personal account to 3-1-16 | 5,288.26 |
| | $ 444,166.68 |
| | $ 665,952.76 |
| *Adding interest at 6% from Feb. 21, 1918 to June 2, 1932 (14 years and 102 days; the daily rate is $109.17 on the 102 days in 1932) | 570,535.72 |
| TOTAL amount of claim to and including date of Judgment, 6-2-32 | $1,236,488.48 |

Items in this account are not self-explanatory. The appropriateness of many of them was in dispute and is still so. The net profits of the Guyton & Harrington Mule Company, $3,235,569.48, as the court found, is further elucidated by the court in the summary which we call B, as follows:

## SUMMARY B.

### GUYTON & HARRINGTON MULE COMPANY

| | | | Reference |
|---|---:|---:|:---:|
| DISTRIBUTIONS MADE: | | | |
| Dividends paid May 14, 1917, on basis of stockholdings at that date | | $2,892,372.97 | (1) |
| Dividends paid Feb. 21, 1918, on basis of stockholdings at that date | | 489,845.65 | (1) |
| Total distributions | | $3,382,218.62 | |
| Trust fund for payment of contingent expenses | $215,655.65 | | |
| Legitimate expenditures | 172,644.96 | | |
| Balance unexpended | | 43,010.69 | (20) |
| | | $3,425,229.31 | |
| (Note: The above items of distribution include payment made to Mr. Beers.) | | | (8) |
| DEFICIT ACCOUNT: | | | |
| Deficit account as computed from the books | $228,850.85 | | |
| Interest due to J. D. Guyton, earned prior to 9-1-14 | 109,069.58 | | |
| Interest due to W. R. Harrington, earned prior to 9-1-14 | 57,326.40 | | |
| Total | $395,246.83 | | (8) |
| Credited to deficit account: | | | |
| Profit on sale of Kansas City real estate before 9-1-14, and not posted | $ 27,017.01 | | (3, 4) |
| Growing crops not posted. | | | |
| * Corn, 690 acres at $60 | 41,400.00 | | |
| Ensilage, 560 acres at $65 | 36,400.00 | | |
| Oats, 140 acres | 3,500.00 | | |
| Blue Grass, 280 acres | 3,360.00 | | |
| | $111,677.01 | | (3, 4) |
| Book value of Lathrop real estate | $102,777.90 | | |
| Book value of buildings, Lathrop | 137,236.36 | | |
| Book value of improvements, Lathrop | 13,269.00 | | |
| | $253,283.26 | | |

| | | | |
|---|---|---|---|
| Fair value of lands (6) | $334,000.00 | | |
| Less book values | 253,283.26 | 80,716.74 | (4) |
| | | $192,393.75 | |
| Fair value of lands at Clarksdale, Miss. | $ 65,000.00 | | |
| Book value | 13,938.72 | | |
| Undervaluation | | 51,061.28 | |
| Undervaluation of Tennessee lands | | 20,360.00 | |
| Undervaluation of Mississippi lands | | 00,000.00 | (None claimed) | (4) |
| Total increase in values over books (9-1-14) | | $263,815.03 | |
| ACTUAL DEFICIT on 9-1-14 | | $131,431.80 | |
| Total distribution of earnings, including payments to Mr. Beers. and the remainder of trust fund | | | $3,425,229.31 |
| Adding deficit existing 9-1-14, paid by defendants out of earnings | | | 131,431.80 |
| | | | $3,556,661.11 |

DEDUCTIONS:

| | | | |
|---|---|---|---|
| (1) Profits on sale of cattle and hogs, not pertaining to Joint Adventure | | $ 68,563.67 | (19) |
| (2) Profit on seed account, admitted to be fairly accurate | | 45,764.72 | (21) |
| (3) Profits on Mules furnished U. S. Government, before entering War: | | | |
| At San Antonio, 2688 mules @ $15.14 | $40,697.93 | | (16) |
| At Los Angeles, 830 mules @ $19.71 | 16,361.63 | | (16) |
| At Kansas City & East St. Louis, 2050 @ $19.71 per head | 40,405.50 | 97,465.06 | (16) |
| (4) Profit on 25,550 mules, not sold to belligerent powers @ $3.50 per head | | 89,425.00 | (16) |
| * | | $301,218.45 | 301,218.45 |
| | | | $3,255,442.66 |
| (5) Add: 6% Simple Interest charged to members of Joint Adventure on drawing accounts | | $136,634.40 | |
| * Less—Portion applicable to drawing accounts on Stock Yards Horse and Mule Company books | | 44,936.22 | (P. Ex. 1) 91,698.18 |
| | | | $3,347,140.84 |
| * (6) Deducting J. Frank Guyton's 1/30 | | (9) | 111,571.36 |
| | | | $3,235,569.48 |
| (7) Deducting nothing for use of facilities, leaves a net profit for Joint Adventurers | | (22) | $3,235,569.48 |

* Changes after certain corrections of working papers.

This brings us to the items of that summary.

A vigorous contest arises upon the deficit account, $228,850.85, which applies to the book value of the assets of the Guyton & Harrington Mule Company September 1, 1914.

The Company was incorporated with a capital stock of $300,000, which amount was accounted for on the final distribution to Guyton and Harrington stockholders at the end. It transpired that September 1, 1914, the date of the joint adventure agreement, the actual assets of the corporation, as shown by its books, were less than $72,000. Hence the deficit, which was made up out of the profits of the joint adventure, is to be accounted for as such profits. Two other items are added to the deficit: interest paid Guyton $109,069.58, and interest paid Harrington $57,326.40, making the

total deficit $395,246.83. There is a contest about each of those items.

GUYTON AND HARRINGTON WITHDRAWALS. October 10, 1916, J. D. Guyton withdrew from the profits of the corporation $129,900.55. At the same time W. R. Harrington withdrew $69,705.32. These sums represented interest due those men on debts incurred to them by the company in 1907. Plaintiff's accountant added those sums to the deficit account of Guyton & Harrington Mule Company on the ground that they were paid out of the profits due to the joint adventure. The court allowed as paid to Guyton $109,069.58, and as paid to Harrington $57,326.40. These sums were interest accrued on those old debts up to the time of the joint adventure agreement September 1, 1914; all that interest was paid out of the profits of the joint adventure and the sums properly allowed as such profits. The balance of the two withdrawals, about $33,000, interest which accrued *after* the beginning of the joint adventure, the court disallowed on the ground that it was a part of the expense of that enterprise. All the assets of the Guyton & Harrington Company were devoted to the joint adventure by the principal stockholders, Guyton and Harrington. Whatever facilities and assets that Company had were so used. Since that Company operated on borrowed capital the interest on such debts was a part of its operating expenses. Therefore the interest which accrued on those debts after the beginning of the joint adventure was properly expenses of that adventure. Those sums allowed, added to the deficit, made it $395,246.83, so that the book value of the corporation assets was less than nothing. The court, however, decided that some of the property "was carried on the books of the company at a greatly reduced figure."

ACTUAL VALUE. The court decided that the *actual value* of the corporation's property, instead of the book value, should be considered and credited to the assets in reducing the amount of the deficit; also that certain property not listed in the books should be added to the credits. Plaintiff claims that there should be no allowance of credit at all in deduction from the deficit, that the book value of the assets of that corporation was conclusive, and that any value in excess of that sum, on the final dissolution of the corporation, were profits which should go to swell the amount realized in the joint adventure. He argues also that it made no difference in the determination of this matter whether the property of the Guyton & Harrington Mule Company was worth one dollar or a million dollars; that its specific property was devoted to the enterprise by Guyton and Harrington, and whether it increased in value or decreased in value made no difference. That view would not help us

to ascertain how much of the profits of joint adventure was devoted to maintaining that company's assets.

There seems to be no dispute between the parties that the deduction of such value, whether book value or actual value, should be of the date that the joint adventure began, September 1, 1914. On that theory the accountants prepared their summaries. No doubt the accountants for plaintiff pursued the theory which plaintiff and his counsel understood and agreed upon. The court was entirely correct in estimating the actual value of the assets and deducting that actual value from the deficit, leaving the balance to be accounted for as profits of the joint adventure.

The items showing the actual value follow:

THE $27,017.01 ITEM. The $27,017.01 credited to deficit account appears as "profit on sale of Kansas City real estate before September 1, 1914, and not posted."

Plaintiff claims that this is an erroneous credit. It was a sale of real estate belonging to Guyton & Harrington Mule Company prior to September 1, 1914. The court found that prior to September 1, 1914, defendants had sold real estate at a profit of $27,017.01, which had not been credited on the books. This profit, being an asset of that corporation, had the effect of reducing the book deficit. There was some dispute and conflicting evidence regarding the correctness of the sum, but we think the court solved the matter correctly.

■■■ GROWING CROPS. In Summary B appear four items relating to growing crops, not entered on the books of Guyton & Harrington Company, for which the court gives credit to that company in reducing the deficit account, the principal items of which are 690 acres of corn at $41,000, and 560 acres of ensilage at $36,400. The defendants introduced evidence to show that in 1914 the 1670 acre farm belonging to the Guyton & Harrington Mule Company, at Lathrop, was all under cultivation except 280 acres of blue-grass, 1250 acres being in corn, and 140 acres in oats. The last two items are for the value of the oats and the blue-grass. None of this was included in book assets. This was property of the corporation which was not merely used, but *used up* in the joint adventure. The plaintiff's point is that it does not appear upon the books of that company, and that the evidence as to the matter is unworthy of belief. There appears to be no dispute about the existence of those crops, and their use in that enterprise. Undoubtedly then it was part of the expense incurred in carrying out the joint enterprise and properly charged as such. The corn was valued by this court at $60 an acre, and the ensilage at $65 an acre. They were used at a time when prices were extraordinarily high; the British Government was expending vast sums in procuring horses and mules and the dealers in those animals in this country necessarily created a large demand for feed of that

kind. We think the evidence, though conflicting, supports the court in the matter of the value of the crops.

VALUE OF LANDS. The trial court took the estimated actual value of the lands, buildings and improvements at Lathrop, Missouri, belonging to the corporation, in doing so went minutely into the details of each item and deducted from it the book value, giving credit to the assets of the Company for the difference $80,716.74.

The court valued the land at $200 per acre, a very fair value of improved farm land in September, 1914. Defendants claim it had some peculiar value as an incident of the war; a sort of monopoly value. The court weighed the evidence and concluded that the value as found was reasonable at that time and place. We think the evidence supports that conclusion.

The remaining items listed to reduce the deficit account relate to the under valuation of the lands in Tennessee and in Clarkdale, Mississippi. As stated, we think the court solved correctly the question as to that. Thus the total credits amounted to $263,815.03, leaving actual deficit $131,431.80, made up of the profits of the joint adventure and added to the earnings distributed.

We come now to deductions from the profits.

 NON-BRITISH BUSINESS. The deductions shown in Summary B on account of the non-British business, amounting to $301,218.45, are:

DEDUCTIONS:

| | | | |
|---|---|---|---|
| (1) | Profits on sale of cattle and hogs, not pertaining to Joint Adventure | | $ 68,563.67 |
| (2) | Profit on seed account, admitted to be fairly accurate | | 45,764.72 |
| (3) | Profits on Mules furnished U. S. Government, before entering War: | | |
| | At San Antonio, 2688 mules @ $15.14 | $40.697.93 | |
| | At Los Angeles, 830 mules @ $19.71 | 16,361.63 | |
| | At Kansas City and East St. Louis 2050 @ $19.71 per head | 40,405.50 | 97,465.06 |
| (4) | Profit on 25,550 mules, not sold to belligerent powers @ $3.50 per head | | 89,425.00 |
| | | | $301,218.45 |

The plaintiff challenges those deductions, claiming they were profits properly belonging to the joint adventure. This may be determined by the scope of the joint adventure as decided by this court in the former opinion. We analyzed the petition in which it was alleged that pursuant to an understanding between Guyton, Harrington, Wolcott, Beers and Grant, Guyton and Beers, at the expense of the Stock Yards Company, went to Montreal and entered into an agreement with the British Government to furnish that government a large quantity of mules and horses. We then found from the evidence that those six persons went into a joint adventure which was described as follows:

"Upon a thorough study of the entire record, we find from the evidence that J. D. Guyton, W. R. Harrington, Josiah C. Wolcott, H. M. Beers and J. M. Grant engaged together under an oral agreement as joint adventurers in the business of furnishing horses and mules to the British Government and other belligerent allied powers en-. gaged in the World War, and agreed that the joint adventure should include all of such business transacted by them."

Then follow the names of the several corporations and a general statement to include all other agencies under their control, and a statement that the agreement included profits of the feed and care of the horses and mules.

The plaintiff asserts that the first two items in these deductions, $68,563.67 profit on the sale of cattle and hogs, and $45,764.72 profit on seed, were incidental to activities prosecuted on the Lathrop farm during the war period. These items, like the other non-British items, were not segregated from the other profits on the books of the Mule Company, but were all lumped together. The plaintiff argues, therefore, that they are properly profits on the joint adventure.

The Guyton & Harrington Mule Company was not a party to the joint adventure. The joint adventurers attempted only to pledge their interest, their earnings as individuals and stockholders, to that enterprise. Their agreement did not and could not bind the corporation. Any business which the corporation conducted outside the terms of the joint adventure agreement was corporation business and the profits were corporation profits, with which the joint adventurers as such had no concern. It is clear from the determination of this court that those two items had nothing to do with the joint adventure. It pertains to separate activities by that corporation, in which it was probably engaged before the joint adventure began.

The next three items were for mules sold to the United States Government, the profits amounting to $97,465.06. These mules were sold to the Government from San Antonio, Los Angeles and Kansas City in the months of June and July, 1916, before the United States entered the war or contemplated entering it. The total number of

mules so sold was 5,568. It is plain that the profit on those mules was enormous.

It seems that Biddle & Company was in the horse and mule business in Kansas City, and in June, 1916, sold out or abandoned its business and Biddle became employed by Beers or by the Guydon & Harrington Mule Company. The business he thereafter did for that business was mainly in connection with those non-British mules.

It is argued by plaintiff that those mules were furnished to the United States in order to prevent the stopping of the British business by the United States Government, and was therefore an incident to the joint adventure. We find no evidence of that. At the time those mules were furnished to the United States Wolcott was disabled and did not actively participate in the business. There is nothing to show that he had any knowledge of those sales or that they were treated as coming within the scope of the joint adventure agreement. It did not come within the *terms* of that agreement. The court properly disallowed it as a profit of that adventure.

The final item of those deductions relates to 25,550 mules *not* sold to the belligerent powers, the profit amounting to $89,425. The plaintiff argues that these mules were "rejects," that they were purchased for delivery to the British Government, but on inspection were rejected as unfit for that service.

If the evidence had shown that those mules were originally bought for the British trade and were rejected as unfit and then disposed of as a side line in the prosecution of that business, there would be some force in the plaintiff's claim, but the evidence fails to show any such thing. There was no evidence in the former trial nor at the last trial, to show how many of those mules were rejects, nor that *any* of them had been bought for the British trade. Mr. W. R. Harrington testified at the former trial that in March 1915, when he returned from New Orleans he "walked down to the mules and looked at them. Twenty-seven hundred and some odd mules there in the barn, part of them rejects . . . most of them rejects."

J. D. Guyton testified at the former trial that,

"Mr. Grant had several hundred mules, or a thousand, maybe, on hand, rejected mules, and also had his line out and men buying mules in large numbers."

He swore, as did also Harrington, that Harrington claimed the profit on those mules.

Mr. Growals, defendants' accountant, testified that these mules were not so segregated on the books of the company except that it *was* shown whether the mules handled went to the British Government, or to some other place.

During his testimony it was stated by the plaintiff's counsel that there was no profit on those mules, and this question was asked:

"Now those mules, that twenty-five thousand head, included all the rejects they had?

"If they were rejects, yes."

Mr. Growals repeated that several times ". . . if they were rejects."

In the colloquy which followed defendants' counsel suggested that that number was possibly made up of some rejects and included all the cotton mules sold through the South and all mules sold to others than belligerent governments. By "cotton" mules was meant mules sold to cotton planters—a business in which apparently the Guyton & Harrington Company was engaged before the joint adventure began. Mr. Loucks, the plaintiff's accountant, testifying in regard to those 25,550 mules, said:

"*Some were known as rejects handled in an account known as 'Rejects,' and some were known as cotton mules.*"

From this we must infer that the cotton mules were not known as rejects.

Mr. Biddle testifying about that at the former trial said, in regard to the Stock Yards Company buying mules:

"They didn't buy any for me, *I was taking what was left after everybody else got through with them* and selling them.

"Q. Were you selling the rejects? A. I suppose you might call them rejects. Sold lots of young mules."

The witness stated that he didn't sell any mules to the British Government, and was asked:

"So the account you had didn't figure in the British Government account? A. No."

The burden was on the plaintiff to prove that mules bought for the purpose of selling to the British Government were rejected on account of failure to come up to specifications, and that such mules were dealt with by the joint adventurers through some of their agencies and realized a profit to the joint adventure.

There are probably other references in the record to those twenty-five thousand mules, but we find none more clearly referring to rejected mules than the evidence quoted above. There was no proof of any definite number of rejected mules. At one time twenty-seven hundred mules were mentioned by Mr. Harrington. He said the most of them were rejects. But the number is not fixed. The plaintiff's accountant, Mr. Loucks, stated that the rejects were handled in an account known as "Rejects.". It must be remembered that his information, and that of Mr. Growals, defendants' accountant, was obtained from the books, there being no other evidence as to the number of rejects the books contain the only information which could throw any light upon that subject. The testimony of plaintiff's own accountant seems to show there was a separate account of rejects.

The evidence of the number was apparently available and plaintiff failed to produce it, though it probably did not show how many rejects, *if any*, were bought for sale to the British trade. The court had no means of knowing how many rejects were there.

More important, there was no evidence whatever that *any* of the rejects had been bought for the British business, or for the purpose of sale to the belligerent powers. The Guyton & Harrington Mule Company had been in business a long time, handling mules and horses. So had the Stock Yards Company. A great many of those mules were cotton mules, sold to the southern trade; bought for that purpose. There is no evidence as to whether or not any of the rejects had been bought for the cotton trade and found too young or otherwise unfit. There is no evidence whether or not any of those rejects were in the list to be sold to the United States during the time that Guyton & Harrington Company were buying mules and selling them to the United States before it entered the war. There was no evidence that all of the rejects accumulated *after* September 1, 1914, the date of the joint adventure agreement.

The effect of Mr. Biddle's testimony is that he handled rejects and that he had nothing to do with the British business. In the absence of evidence to show how many, *if any*, of those rejects arose out of British business the court properly excluded the profits on such mules.

There is confusion in this account because these items of profit were not separated from the general profits. The two accountants, Mr. Loucks and Mr. Growals, and the several parties, did not agree as to the amount of those profits. They were figured by Mr. Growals from what he found in the books. They were estimated somewhat from the general trend of the business, as he discovered it in the books.

The plaintiff makes no definite or specific objection to the method by which he arrived at those profits. The court didn't adopt all the conclusion of Mr. Growals, but modified them and found what the court determined from the evidence constituted the profits of the non-British business. We think the evience sufficiently supports his finding.

The trial court properly found that such profits did not arise from the joint adventure.

 THE FRANK GUYTON ITEM. The plaintiff objects to the deduction from the profits $111,571.36 paid to J. Frank Guyton, a son of J. D. Guyton.

The court found that the stock in the Guyton & Harrington Mule Company of $300,000 September 1, 1914, was divided as follows:

J. D. Guyton_____1450 shares
J. Frank Guyton_____ 100 shares
W. R. Harrington _____ 1450 shares

There is no intimation that J. Frank Guyton did not in good faith own these one hundred shares and the above profits paid him were due as the net earnings of his one-thirtieth of the stock. It is argued by the plaintiff that Frank Guyton, as minority stockholder, could have objected to the using of the instrumentalities of the Guyton & Harrington Mule Company in carrying out that joint adventure, and since he assented to it and allowed such instrumentalities without protest to go into the joint advenure he is estopped to make any claim against the parties who did go into it.

If he had participated in the joint adventure and received his profits *as such,* a claim of estoppel might be advanced. He in fact received other sums not due him as dividends on his stock in the corporation but that excess was treated as profits of the joint adventure, just as were dividends paid other members of the Guyton family who were nominal stockholders. It would not prevent his receiving what was actually due him on his stock which he owned in good faith. He could not prevent the other stockholders in the Guyton & Harrington Mule Company from engaging in a joint adventure and devoting their dividends to that purpose. The actual operation of the Guyton & Harrington Mule Company probably would have been the same if those other stockholders had not engaged in the joint adventure. He forfeited no right as a stockholder by failure to interfere with that enterprise.

BEERS ACCOUNT. We come now to profits allowed to the joint adventure not appearing as a separate item in Summary B; profits to which defendants object.

Of the dividends, $489,846.65 paid by the Guyton & Harrington Mule Company February 21, 1918, Beers received $43,451.84 charged like the rest to the profits of the joint adventure. Beers held 38 shares of stock in the Guyton & Harrington Mule Company, but it seems that he never received any dividends on that stock. Defendants do not claim that he did. The record shows that he had received at different times from the profits of the Guyton & Harrington Mule Company $234,746.97. This added to the $43,451.84 received February 21, 1918, mentioned above, makes a total of $278,198.81. Defendants admit that this was not dividends and it was not salary, but claim it was a commission of one-eighth of the profits of that company.

They offered in evidence two contracts between Beers and the Guyton & Harrington Mule Company, which provided that he should receive one-eighth of the net profits of all sales of horses and mules including cotton mules at all locations whether heretofore or hereafter used, mentioning the different localities, among them the farms near Lathrop, Missouri, and near Chalmette and New Orleans, Louisiana. The first contract was executed November 21, 1916; the

second one March 31, 1917. If any disagreements occurred between Beers on the one side and Guyton and Harrington on the other regarding the former's share of the profits of the joint adventure, this contract may have been a modification of or in lieu of the joint adventure agreement. This is all the more remarkable because Beers all the time received a salary of ten thousand dollars a year from the Stock Yards Horse & Mule Company. His activities apparently were devoted to that company because, it is stated by defendants, that after the deaths of Wolcott and Grant all the burdens of that corporation fell upon him. Ten thousand dollars a year at that date appears to have been a fair salary for his work. It was the same salary as that received by Guyton and by Harrington whose services doubtless were as valuable as his. Those salaries were credited to expense. There is no escaping the conclusion that the sums mentioned received by Beers were a part of the profits of the joint adventure because of his interest in that business. The court correctly held that being a party to the joint adventure agreement he could not make a contract with the G. & H. Mule Company in conflict with that agreement, so that his net profits were a part of the profits of the joint adventure.

█ THE USE OF THE G. & H. MULE COMPANY'S PROPERTY. The defendants earnestly insist that in addition to the deductions from the profits the Guyton & Harrington Mule Company, it should have had an allowance for the use of its property and facilities during the term of the joint adventure. Defendants' accountants listed that credit thus:

"Deduct the claim for use of facilities 50% of the profits, *per testimony*, $1,171,184.96."

This is an assertion that there was testimony which shows the *rental value* of that property during the period amounted to that great sum. We are cited to no such testimony. Defendants in their elaborate argument do not mention those figures nor give definite estimate of what that rental value was. The actual value of the assets of that corporation as estimated by the court was only a little more than the face of the capital stock. This value was reduced by very large debts. The estimate of defendants' accountant is that the use of these facilities was worth about 200 per cent per annum of their value.

Defendants argue that those facilities, particularly the 1690 acre farm and stables at Lathrop, Missouri, were indispensable to the use of the joint adventure, that no such facilities could be obtained elsewhere in the hurried assembling and reconditioning of the stock for shipment.

If such an item were allowed at all it should be no more than a reasonable rental value of those facilities. We find no evidence that adequate facilities could not have been obtained elsewhere. The

court disallowed the claim. No sum was allowable because there was no evidence to sustain it.

Another reason why the defendants were not entitled to such compensation is that that corporation is not a party to this proceeding. If allowance were made for such use, to whom should allowance be paid? There was no claim by the corporation and there should be no claim because it is not a party. The intimation is that Guyton and Harrington as stockholders in the company might make claim. They could not do so. Under the holding of this court in the last opinion, the agreement between the parties to the joint adventure was that the profits which they realized through the several corporations, *as stockholders and individuals,* went into the profits of the joint adventure. So far as Guyton and Harrington as individuals are concerned, the use of the property of the Guyton & Harrington Mule Company and that of the Stock Yards Horse & Mule Company went into that adventure. The latter company had assets at that time which were devoted to the enterprise by its stockholders, amounting to $415,255.02. The use of the property of one corporation went in the same as that of the other.

THE STOCK YARDS COMPANY. The detail summary of the Stock Yards Horse & Mule Company, which we will call Summary C, is as follows:

### SUMMARY C
#### Stock Yards Horse & Mule Company

DISTRIBUTION TO STOCKHOLDERS:

| | | |
|---|---:|---:|
| Dividend of May 28, 1917 | | $2,214,337.53 |
| Dividend of July 13, 1917 | | 862,041.58 |
| | | $3,076,379.11 |
| Adding additional working capital not included in the foregoing distribution | | 246,666.56 |
| | | $3,323,045.67 |
| Deducting sum paid in by Mr. Guyton, Mr. Harrington and Mr. Beers, to replace moneys expended for unexplained expenses, and for which Mr. Wolcott was personally concerned as General Manager of the Company | | 237,000.00 |
| | | $3,086,045.67 |
| Deducting income tax paid by certain stockholders after dissolution of company, and in which the Wolcott interests should have participated | $ 98,463.28 | |
| Deducting the fee paid to Rozzelle, Vineyard & Thatcher for legal services in the matter of dissolving the company | 25,000.00 | |
| Deducting from the $10,018.45 expense item, the loans to Curry, donation to Mrs. Winkler and other items shown up on pp. 1839-1848, amounting to $286.90, leaves a balance of | 9,731.55 | 133,194.83 |
| | | $2,952,850.84 |
| Add: | | |
| 6% Simple Interest charged to members of Joint Adventure on drawing accounts on Stock Yards Horse & Mule Company books | $136,634.40 | |
| Less—Portion applicable to drawing accounts on books of Guyton & Harrington Mule Company—Previously added | 91,698.18 | 44,936.22 |
| PROFIT and CAPITAL belonging to Joint Adventure | | $2,997,787.06 |
| Profits from Womack & Stroud Mule Company | | 265,185.10 |
| | | $3,262,972.16 |

■ THE $237,000 ITEM. An item of $237,000 the court designated as the sums paid in by Guyton, Harrington and Beers to replace moneys used for an unexplained expense, and is deducted from the profits of the joint adventure. A vigorous objection is presented by plaintiff against the propriety of that deduction.

It appears in the evidence of the plaintiff's accountant Mr. Loucks, that from September 9, 1914, to July 23, 1915, forty-seven checks for five thousand dollars each, and two checks for one thousand dollars each were drawn on the funds of the Stock Yards Horse & Mule Company. Those checks were not in evidence and there is no evidence as to who drew, signed or cashed them. It is not strange that the checks are not presented. This suit was begun seven years after they were cashed. Canceled checks usually are not kept that long. The books of original entry which possibly might have shown anything about them had been destroyed. All that appears about them was from a loose-leaf ledger of the Stock Yards Company. They are charged to the "C. & A. H. Co." account. The accountant at first thought that those symbols meant cavalry and artillery horses. There was a C. & A. Horse Company organized after the date of those checks, which lends confusion to the account. It is strenuously argued that it is up to the defendants to explain that alleged expense. The first trial was had seven or eight years after those entries were made. Wolcott was dead. Grant was dead. Beers did not testify about them an there was no explanation. There is some intimation in the argument that the money was used for some improper purpose in furtherance of the business. It was paid back by Guyton, Harrington and Beers on advice of counsel, in order to meet an inquiry into defendants' income tax returns. Plaintiff's counsel say that at that time and later other moneys were withdrawn from the funds of the Stock Yards Horse & Mule Company, kept out for a time in safety deposit boxes and later returned. Two or three such accounts occur. Such money was not charged to expense. It is argued that this $237,000 was withdrawn in the same way and was not returned, but was appropriated by Guyton, Harrington and Beers.

W. R. Harrington testified that he knew nothing about that item until in 1916, when he had to make his report for the income tax. His attention was called to it by Mr. Rozzelle, his attorney. The court pointed out that those checks were drawn while Wolcott was still alive and general manager of the Stock Yards Horse & Mule Company, and necessarily knew the purpose for which they were drawn. There was no evidence tending to show that Guyton or Harrington drew them or cashed them Harrington had no authority to draw checks for the Stock Yards Company. There was no evidence as to what was done with the money. It was charged to the expense

account. The court having heard all the evidence in relation to it found that the money was used for some unexplained expense, and we think the finding was correct.

THE $25,000 ITEM TO ROZZELLE. In the trial court's summary of the Stock Yards Company account appears an item, as follows:

"Deducting the fee paid to Rozzelle, Vineyard & Thatcher for legal services in the matter of dissolving the company $25,000," which is among the deductions from the net earnings of that company. The plaintiff points out that that sum was paid by the stockholders in that corporation after the dissolution of the corporation and claims, therefore, that it is no part of the expense of the joint adventure.

The firm of lawyers, May 3, 1917, entered into a contract in which they agreed to render the Guyton & Harrington Mule Company, the Stock Yards Horse & Mule Company, and Wolcott, Beers & Grant Mule Company, and all stockholders of said companies "such legal services as may be required . . . in adjusting and taking care of the legal affairs of said companies and persons, . . . to the close of the business, . . . not exceeding July 1, 1919."

The writing shows on its face erasures and interlineations. The year 1917 was changed to 1919 as the end of the term of service, and the word "year" changed to the word "time," to make the contract include the whole period of the adventure.

If any doubt were cast upon those changes, those attorneys ratified the extension of the time of the service by the following addition in Mr. Rozzelle's handwriting:

"Legal services to Jany. 1, 1917 have been paid and all legal services needed since that date are covered by this agreement.

"Rozzelle, Vineyard, Thatcher & Boys."

It may be inferred that this was written and signed when the interlineations were made for both are written in ink.

Plaintiff claims that the contract was made "in contemplation of subsequent salvage of income taxes in enormous amount." Twenty-five thousand dollars, the portion due the Guyton & Harrington Mule Company, was paid by it during the progress of the joint adventure.

Mr. Rozzelle for his firm undertook the care of all legal business coming within the activities of the joint adventure including service rendered in the income tax litigation and settlement. The allowance here was proper.

*PROFIT OF THE WOMACK & STROUD MULE COMPANY.* There appears in the summary of the Stock Yards Horse & Mule Company a profit attributed to the Womack & Stroud Mule Company, $265,185.10. That was a corporation subsidiary to the Stock Yards Company. It is stated by the defendant that that company was incorporated in 1909 with a capital stock of $10,000. The plaintiff's ac-

countant, Mr. Loucks, presented in his summary Plaintiff's Exhibit 1, showing the net profits of that company as $275,185.10; ten thousand dollars more than allowed by the court. It is stated by the witness that $275,185.10 was the profit upon which the income tax was assessed against that company. The books of the company had been lost, the witness stated, and practically the only evidence they had of such income was the fact that it was so assessed for the income tax. The record showed, the witness stated, that the company was incorporated with ten thousand dollars fully paid up capital, one-fourth each by Guyton and by Harrington, and one-sixth each by Wolcott, Beers and Grant. The amount of its property was ascertained from the books of the Guyton & Harrington Mule Company and the Stock Yards Company, and the income tax returns. There was no evidence that the corporation had any assets at the beginning of the joint adventure enterprise. The trial court found that the net profits agreed upon by the accountants was $275,185.10. The capital stock was ten thousand dollars, of which Wolcott had one-sixth. In the final summary, however, as stated above, the court fixed the profits at $265,185.10. Certainly if the company had no assets when the joint adventure started and the net profits were $275,185.10, then Wolcott would be entitled to his share of the total amount. There is no reason for the deduction of the ten thousand dollars. There is nothing to show that any assets represented by the capital stock were divided at the end of the adventure, or remained undivided. Manifestly, if the corporation was brought into the enterprise without assets its total assets at the end were the profits of the joint adventure.

We think, therefore, that the court was in error in reducing that profit ten thousand dollars.

 $272,438.42 EXPENSE IN INCOME TAX MATTER. We come now to items which the court refused to allow as deductions claimed by defendants from the income of the joint adventure. The items are set forth in the defendants' account, as follows:

Deduct:

Fees, expenses, etc., paid subsequent to dissolution of the corporations by the stockholders of record at dissolution. None of these amounts were recorded on the books of the corporations nor were they previously deducted in these computations—

| | |
|---|---|
| Legal fees in Thompson-Robertson case | $ 10,000.00 |
| Payment in settlement of Thompson-Robertson case | 50,000.00 |
| Legal fee in the Wisler case | 10,000.00 |
| Fees and expenses in the Federal Income tax cases— | |
| Paid Smith, Lunsford & Wright | 12,685.89 |

| | | |
|---|---|---|
| Paid Hopkins, Starr and Hopkins | 95,483.56 | |
| Paid Arthur Anderson & Co. | 45,436.58 | |
| Paid Rozzelle, Vineyard & Boys | 25,000.00 | |
| Paid John H. Lucas | 20,000.00 | |
| Rent | 2,240.00 | |
| Miscellaneous | 1,592.39 | $272,438.42 |

Over the objection of plaintiff the court allowed the first three items, as shown above in Summary A. Commenting upon those items the court said that the Thompson-Robertson case, a suit for $1,200,000, which was settled for $50,000 as shown by the briefs in the case, was an action for damages for violation of the anti-trust law; that the issues necessarily involved Mr. Wolcott's interest as well as that of the other parties, and the fact that the action was settled by the payment of $50,000 leaves one to suppose that the defendants were unwilling to risk the hazard of a trial. The court found upon the evidence that the item was a proper expense of the joint adventure, we think correctly. The same would apply to the fee of ten thousand dollars paid in the case.

The Wisler case was an action based upon contractual relations involving the joint adventure created through negotiations with Wolcott personally as well as with the other defendants. The action was defeated by a forced dismissal and the attorney's fee of $10,000 was paid. The record supports the court in making that allowance.

The remaining items amounting to more than $202,000 were disallowed over the objections of defendants. These were expenses incurred by the defendants and their corporations in defense of income tax assessments made by the Federal government. Defendants introduced in evidence letters addressed to Guyton and to Beers by the Deputy Commissioner of Internal Revenue, showing that the income taxes assessed against the corporations and the three individuals, Guyton, Harrington and Beers, totaled $19,000,000 for the year 1917. The gross business of the corporations and the individuals was about $88,000,000. A number of suits were filed against the corporations and against Guyton, Harrington and Beers by the United States Government for that enormous income tax. They employed accountants to examine their books and ascertain their actual gains, and employed attorneys in that connection as shown in that statement. The result was that the total income tax paid was about $98,000, a reduction from $19,000,000 claimed.

Guyton and Harrington divided their stock with the members of their families so that the separate incomes of each individual of the Guyton family was about one-fourth of the income that J. D. Guyton as an individual would have received, and each individual of the Harrington family about one-third of what W. R. Harrington would have received. These payments were designated as "the distribution."

On account of the excess profit tax, if the total distribution had been made to Mr. Guyton, Mr. Harrington and Mr. Beers, the total tax would have been much greater than it was, distributed among the several individuals comprising the families of Guyton and Harrington.

The items listed show the character of this expense, the greater part of it fees of expert accountants in examining the books of the corporation and the records in England.

The defendants introduced evidence to show that the payments were actually made and were reasonable for the services rendered. Altogether it saved the defendants great sums. The plaintiff disputes only the *propriety* of charging that expense as expense of the joint adventure in reduction of the profits. The trial court allowed the first three items of the account, as noted above, relating to other litigation, but refused to allow the remaining items of more than $202,000, making this distinction:

"The claim here presented (the first three items) is unlike the claim for expenses growing out of the action filed by the United States Government for income taxes. In the latter case the defendants were protecting not only their own rights but funds that they wrongly obtained from Mr. Wolcott. They should bear the expense."

We think the court instead of stating a reason why Wolcott should *not* bear his part of that expense, states a reason why he should. The income tax was assessed for the year 1917 upon the profits of the corporations and the stockholders and was paid by the members of the joint adventure who received the profits. Any expense incurred in the protection of those profits was a proper expense of the joint adventure.

It is strongly argued by the plaintiff that the defendants concealed or destroyed the books so that the United States Government had difficulty in ascertaining what the profits were, and therefore made a gross assessment against the gross earnings; the defendants were at fault for the excessive assessment. We do not find in the evidence that such was the sole reason for the excessive assessment. It was an assessment on gross sales.

The actual net earning of each individual was largely decreased by dividing them up among the members of the Harrington and Guyton families. If that were a fraud upon the United States Government it did not result unfavorably to the Wolcott interest, but to the contrary. If Wolcott had remained in the adventure to the end his share of the income tax would have been greater than it was as the tax was paid.

The joint adventure was a business hurriedly begun and loosely conducted, but there was nothing in its operations to justify the Government agents in assessing the enormous income tax which they did assess. It was a grab on suspicion and suits were filed, apparently,

without evidence. They had to be defended and the actual profits revealed.

Attorney fee to Rozzelle, Vineyard & Boys of $25,000 was allowed as expense. That sum was allowed under the contract mentioned above under the heading $25,000 to Rozzelle. The contract of those attorneys covered the service in the income tax matter, and it was paid and allowed once. It should not be allowed again.

The court should have allowed the remainder of the expense account $202,438.42, less the $25,000,—$177,438.42.

██ *TERMINATION OF THE JOINT ADVENTURE.* Defendants contend that they should not be held to account for the profits of the business after March 1, 1916, on the ground that the joint adventure terminated at that time. We are concluded, however, by the former ruling of this court on the former hearing. After considering at length all the evidence upon the subject, 40 S. W. (2d) l. c. 591, we called attention to the course pursued by Wolcott, in that instead of suing for damages he sought an accounting, and said:

"He pursued the latter course, and prevailing therein he was entitled to the accounting for the ascertainment of his share of all the profits that were earned during the entire period of the joint adventure, which we find from the evidence extended from on or about September 1, 1914, to on or about February 21, 1918."

Defendants point to the pleadings as alleging that the joint adventure continued from the first day of September 1914 to March 15, 1916. Before the first trial the plaintiff offered an amendment to the petition to the effect that the joint adventure continued until the first day of January 1918. This amendment was stricken out by the trial court, but nevertheless in the course of the trial it appears that all the evidence was received and the matter treated as if the joint adventure continued until a later date. On their motion for rehearing here the defendants called attention to that pleading and argued the point at some length. This court in passing upon the motion, l. c. 592, called attention to the relief prayed for by plaintiff, such as he might be entitled to under the law, and held that the trial court in passing upon the motion to strike out held the allegations stricken from the petition were not material to the issue, that the plaintiff was entitled to such relief as he would be entitled to if such allegations were in. This court then in passing upon the point said that by answering over after that ruling of the court the defendants waived their plea that the amendment of the petition constituted a departure, and said:

"In this state of the record respondents are not entitled to treat the case as having been tried on plaintiff's original petition."

Thus the opinion forecloses inquiry here into that particular objection.

SIMPLE INTEREST. The plaintiff makes the point that the defendants in retaining possession of the profits which were due the plaintiff became trustees *ex maleficio* and the court should have assessed compound interest with annual rents from February 21, 1918. The court, however, allowed only simple interest. The plaintiff cites a number of authorities to the effect that where the profits of an enterprise cannot be clearly ascertained and are held by a trustee in breach of the trust, compound interest is allowed on a recovery against the trustee. In most of the cases cited there were express trusts such as involve executors, administrators and contractual trustees. Among them is Cruce v. Cruce, 81 Mo. 676, l. c. 686, where on a part of the trust fund recovered compound interest was allowed and on part of it simple interest. This court said, citing other cases, cited by plaintiff here:

"From those cases it appears that compound interest has been exacted from defaulting trustees at various rates . . . according to the facts and circumstances of each case."

What circumstances authorize compound interest is explained in Bobb v. Bobb, 89 Mo. l. c. 421, 4 S. W. 511 mentioning the several earlier cases cited by the plaintiff, and it was said, l. c. 421:

"The doctrine that compound interest may be exacted by way of a punishment for breach of trust, has recently been repudiated by this court."

In Sanguinett v. Webster, 153 Mo. l. c. 374, 54 S. W. 563, this court quoted the Cruce case where it was said, l. c. 684:

"All orders for periodical rests and for compound interest should be adopted, *not for punishing the delinquent trustee,* but for the purpose of attaining the actual or presumed gains, and to make certain that nothing of profit or advantage remains to the trustee, except, perhaps, his commissions on compensation."

It was held in the Webster case that there was no room for presumption of gain, for all gains had been ascertained and no loss accrued to the plaintiff by reason of failure to ascertain the amount.

This is a case for an accounting. There is no room for a presumption that there were items of gain in the joint adventure besides those ascertained nor that the amounts of the several items were not correctly shown. In fact, the plaintiff all through relied upon what was actually shown by the books in the way of profits and objects only to manner of allocating the items. The trial court held that the actual profits were properly ascertained. True, plaintiff complains that some of the books were lost, books of original entry and the like. If there was any concealment of profits or any improper expenditures, it was apparently for the purpose of reducing the income taxes, and possibly for other unlawful purposes that were for the benefit of the adventure. Some such items as already noted

were discovered by the accountants, but the court found that the actual profits were ascertained, and therefore there was no reason for charging more than the statutory six per cent simple interest.

■ JOINT JUDGMENT. Defendants object to the form of the judgment rendered jointly against all of them instead of severally against each for the amount of the plaintiff's share in the joint adventure which each received. The general rule is that an equitable action for accounting where the property sought to be recovered is held separately by two or more defendants the judgment should not be joint as against them all, but the court should render judgment against each according to his several liability. [1 C. J. 646.]

Defendants argue that if the plaintiff had sought to recover in an action at law for damages, no doubt he could recover the judgment against all the tort feasors jointly. But inasmuch as he chose to avoid the transfer alleged to have been procured by fraud and proceeded in equity the rule of equity mentioned above governs, that the fraud slips out of the case. The general rule stated above applies to cases where executors, administrators and other express trustees are called to account if no fraud is shown. Or where partners are called to account for profits unaccounted for. [Portmouth v. Donaldson, 32 Pa. St. 202; Eisentraut v. Cornelius, 134 Wis. 532, l. c. 538.] Cases also are cited where trustees *ex maleficio* when called to account can be required to account for only such property as each received. [Bainter & Barnett v. Fultz, 15 Kan. 323, l. c. 331; Starr v. Case, 59 Iowa, 491.] These cases seem to support plaintiff's contention.

But the weight of authority is that where co-trustees have concurred in a breach of trust they are jointly liable. It is stated thus in 3 Pomeroy's Equity (4 Ed.), section 1081, page 2483:

"The rule is firmly settled that where a breach of trust has affected two or more or all of co-trustees with a common liability, they are liable jointly and severally; each is liable for the whole loss sustained or the whole amount due, and a decree obtained against them jointly may be enforced against any one of them."

That passage is cited and applied in Bloomfield v. Buchanan, 14 Ore. 181; in Proprietors v. Force's Executors, 72 N. J. Eq. 56, l. c. 128; in Ashley v. Winkley, 209 Mass. 509, and other cases; all of them equity actions for accounting.

The principle applies with equal or greater force to trustees *ex maleficio*. It is said in the same volume of Pomeroy's Equity, section 1053, page 2405:

"The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto,* are practically without limit. The principle (reaching property in the hands of either the wrong-doer or any subsequent holder) is applied wherever it is necessary for the ob-

taining of complete justice, although the law may also give the remedy of damages against the wrong-doer.''

In this case while Wolcott's transfer was made to Guyton it does not appear in the record that Guyton received the sole benefits which would have accrued to Wolcott. He shared with Harrington and Beers in various degrees, with the former in accordance with their stockholdings, and with Beers in accordance with the contract which seemed to have replaced so far as he was concerned the joint adventure agreement. Wolcott's interest was merely extinguished. This court could not follow the fund into the hands of those to whom it ultimately went. Guyton individually did not receive all the profits coming to him, but such profits were divided among members of his family in various amounts according to certain nominal stockholdings which the books showed each later had, and the same way to members of Harrington's family. None of those members of the family was a party to this suit. These divisions were made by and with the consent of each of those three men. Having thus deliberately scattered the proceeds of Wolcott's share, they cannot be heard to claim that the follow-up method of accounting would apply.

Defendants cite Hunter v. Hunter, 50 Mo. 445. This was an action for accounting against two trustees *ex maleficio* who had deceived the owners of land as to the price for which it could be sold, and had sold it for a larger price. One of the trustees got all the proceeds, the other got none but obtained a judgment against the co-trustee for his share. The plaintiff by order of court was subrogated to that trustee's right against the other trustee so that the recovery was in fact against both, depriving one of his judgment against the other and holding the other for the whole. The distinction in that case is that the decree should not be rendered against one who profited nothing by the deal. Other cases from other jurisdictions are cited to the same effect. We do not think that ruling detracts from the general rule quoted from Pomeroy's Equity above.

Deducting $177,438.42 as held above for expenses of the joint adventure in fighting income tax assessments, and allowing $10,000 added to the profits of the Womack & Stroud Company not allowed by the trial court, leaves a net deduction from the total profits of $167,438.42. Wolcott's share of that deduction, 165-1/3 one-thousandths, represented by the decimal .16533, would be $27,682.59. The interest on $27,682.59 for 14 years and 102 days at six per cent is $23,717.32, making the total deduction from the judgment $51,-399.91.

Therefore it is ordered that the judgment be modified by subtracting that amount. Leaving the judgment for plaintiff as of its date June 2, 1932, $1,185,088.57, and as modified said judgment is affirmed. All of the judges concur, except *Ellison, J.,* not sitting.