In re G. A. BUDER and OSCAR E. BUDER.—No. 40277.—217 S. W. (2d) 563.

Court en Banc, January 7, 1949.

Rehearing Denied, February 14, 1949.

*Thos. B. Curtis* for informant.

*Taylor Sandison* for respondent G. A. Buder.

798

800

*Jones & Jones* and *Langdon R. Jones* for respondent Oscar E. Buder.

[565] CONKLING, J.—This disbarment proceeding against G. A. Buder and Oscar E. Buder, practicing attorneys at the bar of this Court, hereinafter called respondents, was instituted under our Rule 5 by The Advisory Committee, hereinafter called Informants. We granted Informants' application for leave to file the information in this Court. It was filed on January 10, 1947. Respondents filed their separate answers. We appointed Honorable Justin Ruark, of the Newton County Bar, as Special Commissioner to hear the evidence and to report findings of fact and conclusions of law. That was done. Respondents filed their separate exceptions to that report. The matter was briefed and we heard oral argument.

Counts I, II, III and IV of the information charged generally that respondent G. A. Buder was a trustee of a trust estate created in 1909 by Sophie Franz; that respondents, practicing law in St. Louis under the firm name of Buder & Buder, were attorneys for the Ehrhardt D. Franz estate, for the widow Sophie Franz, who had a life estate under the will of Ehrhardt D. Franz, and for certain remaindermen of that estate; that they represented also the trustees of the above trust estate; that they endeavored by instruments drawn for certain remaindermen to extinguish the remainder interests of their clients; that with respect to certain claims of the trustees for commissions as compensation (and as to which claims respondents had a financial interest) the respondents represented conflicting interests to the injury and detriment of their clients; that knowing they were not legally entitled thereto, trustees claimed and respondents had allowed as compensation for the trustees not only five per cent on the trust res owned by

Sophie in her own right but also five per cent on the remainder interests of certain of respondents' clients. The above will be hereinafter referred to as "the trustees' commission matter".

On Counts V and VI, the Denver National Bank matter, and as to which the Special Commissioner found in favor of Oscar E. Buder, the only respondent charged in said counts, it is our considered conclusion upon the record now before us that no other finding is warranted. The issues now before us in this proceeding are not those of Buder et al. v. Denver National Bank, 151 Fed. (2d) 520. In the record now before us are many facts and circumstances (unnecessary to detail here) which, from the statement of facts in the just above cited opinion, were not in the record in the above reported case. We therefore do not burden this opinion with either a statement of facts with reference thereto, or any discussion thereof. Counts V and VI of the information will be dismissed.

Count VII against respondent G. A. Buder, alone, as executor of the estate of Sophie Franz, pending in the Probate Court of the City of St. Louis, charged that he removed "from the assets of said estate" $124,917.40, and substituted "in lieu thereof" certain allowed claims of doubtful value which were due Buder & Buder. This will be later referred to as "the administration matter".

The Special Commissioner found for Informants and against both respondents on Counts I, III and IV, but only insofar as those counts pertain to representation of conflicting interests in respect to the trustee's commission matter. No charge was made in the information as to Oscar E. Buder on Count II, but upon that count as to G. A. Buder, the Special Commissioner's finding was for Informants. Upon Count VII, the administration matter, the finding of the Special Commissioner was in favor of Informants.

The facts are long, involved and difficult to condense. They cover many years and have been laboriously and painstakingly drawn from many volumes of transcript and exhibits. Ehrhardt D. Franz died testate in St. Louis in 1898. He was survived by his widow Sophie; and their ten children. Among them were G. A. Franz and E. W. Franz, sons, and Mrs. Zimmerman and Johanna Fiske, daughters. His residuary clause bequeathed all his estate to the widow, Sophie, for life, with remainder over to his ten children in equal shares. His estate inventoried less than $100,000.

In the assets of his estate were 210 shares of stock of American Arithometer Company [566] of a then value of about $20,000. Soon thereafter that company declared a 100 per cent stock dividend. Thereupon the estate held 420 shares. In 1905 Arithometer was reorganized and changed its name to Burroughs Adding Machine Company. The Franz estate was thereupon issued 4200 shares of Burroughs stock. By numerous stock dividends the original 210 shares of Arithometer had grown by March 1, 1929 to be 282,500 shares of Bur-

roughs with a value estimated at $25,000,000. That figure does not include certain stock rights nor certain preferred stock dividends issued and redeemed above par.

Prior to 1898 respondent G. A. Buder was attorney for Ehrhardt D. Franz. After Franz' death he represented Sophie. The respondents organized the law firm of Buder & Buder in 1908 and that firm was thereafter her personal counsel. Buder & Buder dissolved their law partnership in 1945. Each respondent is now represented by separate counsel.

At her request, respondent G. A. Buder, in January, 1909, prepared and Sophie executed a trust instrument conveying her property, including her life interest in her deceased husband's estate, in trust to G. A. Franz (one of her sons) and to respondent, G. A. Buder, as trustees of the trust. Among the other property conveyed to the trustees was her life estate in the 4200 shares of Burroughs. In the trust instrument certain payments were provided from income for Sophie and for each of the ten remaindermen. It was also provided therein that Buder & Buder should serve as counsel for trustees. In May, 1909 the Franz children, or a representative of each (excepting only E. W. Franz, who refused to attend, and Mrs. Zimmerman and Mrs. Holdaway, daughters) met with their mother, Sophie, and respondent Oscar E. Buder, at Las Vegas, New Mexico, so that the trust instrument "could be explained to the children". The question of the commission of the trustees was there discussed. Without formal or definite agreement, those present seem to have understood and assumed that the trustees' commissions under the Sophie Franz trust would be five per cent. The understanding was based on the then existing 4200 shares of Burroughs. There was no discussion respecting and no explanation made as to the possibilities of future stock dividends. Respondents contend, however, that at that conference of nearly forty years ago there was a meeting of minds and a valid oral agreement fixing compensation of the trustees at five per cent of the corpus of the entire trust property. They further claim their view of the result of that conference is supported by the action of the remaindermen in the 1920 Burroughs stock rights matter.

In 1920 Burroughs issued certain stock rights. In an agreement of January 7, 1920, between the trustees, Sophie and all the remaindermen, providing for the exercise of certain stock rights, the remaindermen agreed and the trustees received a five per cent commission on the distribution of 12,600 rights to subscribe to Burroughs stock.

In July, 1924 Burroughs issued a 100% stock dividend and certain preferred stock. The preferred was called in 1926 at $105 per share. In connection therewith respondents were paid a special fee of $81,000, which was charged against Sophie. Respondents also were paid an annual retainer as counsel for the trustees. As the trust estate increased in value the retainer increased in size.

About 1924 there arose some dissention between the trustees and the owners of 6.2/3 shares of the remainder estate on the one hand and the owners of 3 1/3 shares on the other. In an action filed in March, 1924, by remainderman E. W. Franz, in the Federal District Court at St. Louis, it was alleged that the trustees were denying any title in the remaindermen. That action prayed a disclosure of assets, adjudication of title thereto and accounting. The trustees, Sophie and all other remaindermen or surviving remainder interests were finally made defendants. In an answer filed by Buder & Buder, for defendant G. A. Buder, as trustee, it was contended that the increase of the estate through stock dividends was income and therefore property of the life tenant; and that petitioner remainderman by advancements had relinquished any remainder interest. The other trustee and **[567]** Sophie, represented by Buder & Buder, by their answers made the same contentions. Respondents were then (in 1926) first employed as counsel for 6 2/3 of the total remainder interests, and filed their answers in that case making the same contention for those clients. The net affect of their answers was that those remaindermen, by Buder & Buder as their counsel, denied the existence of their own interests. Respondents continued to represent those 6 2/3 remainder interests until 1935. In December, 1931, respondents were paid a fee of $100,-000 for legal services to the remaindermen.

On June 25, 1927 this Court in Hayes v. St. Louis Union Trust Company, 317 Mo. 1028, 298 S. W. 91, first ruled ''that the stock dividends were not income of the trust estate but an accretion to the corpus . . .''. On May 16, 1928, in the above mentioned Federal Court case filed in 1924 by E. W. Franz, an opinion of the Federal appellate court in Buder v. Franz, 27 Fed. (2d) 101, written by Judge Stone, ruled for plaintiff, held the remainder interests had vested, that prior agreements had not expunged the remainder interests, criticized the trustees for compelling that litigation and adjudged costs of the litigation against the trustees individually.

By April, 1929, respondent G. A. Buder, as trustee was voting the estate's 282,500 shares of Burroughs. He held and voted considerable Burroughs stock of his own. He was on the Board of Directors of that company, was one of its counsel, and therefore not without influence in the determination of Burroughs policies. After our opinion in the Hayes case, supra, and after Judge Stone's opinion, G. A. Buder voted for two Burroughs stock dividends. G. A. Buder had owned 100 shares in the original Arithometer Company.

In 1929 Sophie and most of the remaindermen met in Long Beach to discuss the possibility of distribution of assets. Respondent Oscar E. Buder attended that meeting but no agreement resulted.

Sophie died testate on April 14, 1930. Her will bequeathed her estate in equal parts to her surviving children. One child was then deceased, having died without issue. Respondent G. A. Buder was

named as executor in Sophie's will. Her estate was probated in the City of St. Louis.

The owners of the remainder interests were anxious to obtain distribution. On May 16, 1930 respondents met with the remaindermen at the Chase Hotel in St. Louis. To that family meeting trustee G. A. Franz, presented a draft of a petition proposed to be filed in the United States District Court. That petition approved all previous acts of trustees, recited that petitioner, G. A. Franz, with other remaindermen had agreed to pay a five per cent trustees' commission upon remainder interests, asked allowance thereof, and prayed distribution of corpus. Each respondent testified he did not prepare that petition. Some remaindermen testified that payment of such commissions was protested at that meeting. It appears that respondents there represented to the remaindermen that the trusees by law were entitled to receive a five per cent commission on all remainder interests; that the remainder interests were legally bound to pay such commissions; that if the remaindermen did not agree to the payment of commissions on their remainder interests at five per cent of the corpus thereof the distribution of such interests would be indefinitely delayed; that if remaindermen refused to agree to five per cent, upon the trustees' application therefor the court would allow more than five per cent; and that it was advisable to sign at once to avoid additional taxes and to facilitate distribution. Some remaindermen there requested a copy of the petition for perusal and study over the noon hour but that request was refused. That afternoon a final draft of that petition was presented to the remaindermen at that family conference. Some remaindermen testified that further statements and representations to the above import were there made by respondents. Remaindermen Johanna Fiske, Amanda Wheeler, Otto B. Franz, Henrietta Holdaway and Adelaide Zimmerman signed the petition that afternoon.

Each respondent denied making the statements attributed to him at the Chase [568] Hotel meeting. G. A. Buder denied he attended the Chase Hotel meeting at all. There was at that time, however, an existing controversy between G. A. Buder and the remaindermen respecting the trustees' commissions. G. A. Buder testified that just prior to that meeting some of the remaindermen had tried to have him waive his claim to a part of the commissions. He declined to do so.

The above mentioned petition was filed in court on May 17, 1930. The trustees later filed in that cause in the Federal Court their final report in which they claimed credit for a five per cent commission on the remainder estates. Exceptions were filed by 3 1/3 remainder interests to portions of the trustees' report including the claim for commissions. In May, 1931 trustees filed in the Probate Court in St. Louis an alternative claim for $810,001.22 for commissions against the Sophie Franz estate, as a five per cent commission upon both the life estate and the remainder interests as constituting a trust fund. It

clearly appeared therein that they were also making such claim for commissions in the Federal Court action for distribution, and did not desire to twice collect such commissions. It was trustees' theory that if the Federal Court disallowed their commission claims, they then claimed the entire amount thereof against the Sophie Franz estate.

On April 1, 1932 a decree was entered by Judge Faris in that Federal Court action upon the then pending pleadings and motions. No evidence was heard. The court noted that at the beginning of the litigation between the parties (in 1924) it was unsettled in Missouri whether stock dividends were income or corpus; decreed that the trustees were entitled to take credit for the five per cent commissions as against those remaindermen who had signed the petition at the Chase Hotel meeting, but disallowed the commissions upon the 3 1/3 shares of the objecting remaindermen. The objecting remainder interests were represented by the Mississippi Valley Trust Company and a guardian ad litem. This allowed the commissions against 6 2/3 remainder interests because those interests had signed at the Chase Hotel meeting. We cannot otherwise construe Judge Faris' oral opinion and his decree. Judge Faris' decree allowed Buder & Buder an attorneys' fee of $115,000. There was no appeal from Judge Faris' decree.

In 1935 the owners of five of the above mentioned 6 2/3 interests discharged respondents as their counsel. Thereafter (1939) Johanna Fiske and others of five remainder interests moved to have vacated the portion of Judge Faris' decree which directed payment of the five per cent commissions by the remainder interests on the grounds, among others, that respondents, while acting as their counsel and for the purpose of enhancing trustees' commissions, made the above set out representations to them, that those representations were fraudulent, fraudulently induced them to sign the petition at the Chase Hotel meeting, failed to except to the allowance of such commissions against their remainder interests and appeal therefrom, prevented them from asserting a defense and thus suffered judgment to go against them. Those contentions of those remaindermen were upheld on February 16, 1942, in Fiske v. Buder, 125 Fed. (2d) 841.

On July 23, 1946, the United States District Court at St. Louis wherein this litigation between these parties has been pending since 1924, in cause No. 6682 entitled "Ehrhardt W. Franz v. Gustavus A. Buder," et al., upon then pending exceptions, made additional findings of fact, conclusions of law and entered a further decree. That court therein found that respondents were employed by remaindermen in 1926; that the interests of trustees and respondents were adverse and antagonistic to the interests of remaindermen; that for their remaindermen clients respondents should have filed exceptions to Judge Faris' decree of April 1, 1932; that the representation of respondents' remaindermen clients in the proceeding before Judge Faris

was non-adversary in character; disallowed credits to trustees for certain payments from estate funds and surcharged the trustees with $100,795.46 therefor.

[569] The court there further found that as to the stock rights distribution agreement of January 7, 1920, the interests of the trustees and the remaindermen were adverse; that the latter were not therein represented by counsel; that neither in fact nor in law were the trustees entitled to any stock rights commissions and surcharged back against the trustees the $45,000 commission then paid by remaindermen to trustees on that matter. The court there also disallowed and surcharged back against the trustees the $115,000 fee allowed respondents by Judge Faris holding "that the said remainder interests were not chargeable with the payment of (attorneys' fees for any services rendered to the trustees for the life tenant"; and that Buder & Buder failed to disclose to Judge Faris that they had received $100,000 in fees from the remaindermen personally for services "so closely related to and connected with the services alleged to have been rendered to the trustees". The court there also surcharged back against the trustees $14,671.14 as interest on estate funds commingled with funds of Buder & Buder.

In addition to cases above noted, other litigation having its inception in the fabulous prosperity of Burroughs and presenting a varied three-decade view of willingness to litigate, though some of its collateral to any instant issue, marched in review through the courts. The curious may read.[1]

ADMINISTRATION MATTER FACTS. As to the above noted administration matter charged in Count VII against respondent G. A. Buder alone. This transaction occurred in April of 1941.

Respondents then owned and held five notes of G. A. Franz, deceased, (former co-trustee) in the total amount of $124,914.70. Those notes had been filed and allowed against the G. A. Franz estate in a total amount (including interest accrued and unpaid) of $172,616.12. These allowed claims were unpaid. The notes were in part secured by collateral pledge and assignments (attached to the notes) purporting to transfer 7500 shares of Burroughs, being a portion of the shares G. A. Franz had expected to receive on eventual distribution of his father's estate.

From the evidence before us the probable condition on final settlement of the G. A. Franz estate is not determinable. It does appear,

[1]Franz v. Franz, 15 Fed. (2d) 797; Franz v. Buder, 11 Fed. (2d) 854, 34 Fed. (2d) 353, 38 Fed. (2d) 605; Mississippi Valley Trust Co. v. Buder, 47 Fed. (2d) 507; Franz v. Mississippi Valley Trust Co., 51 Fed. (2d) 1047; Fiske v. State of Missouri, 62 Fed. (2d) 150; Wallace v. Franz, 66 Fed. (2d) 457, 68 Fed. (2d) 313; Fiske v. State of Missouri, 69 Fed. (2d) 683; Wallace v. Fiske, 80 Fed. (2d) 897; Fiske v. Wallace, 117 Fed. (2d) 149; In re Franz Estate, 344 Mo. 510, 127 S. W. (2d) 401; State of Missouri v. Fiske, 290 U. S. 18, 54 S. Ct. 18, 78 L. Ed. 145.

however, that on April 15, 1941 its assets were so frozen as that it was not then solvent in ordinary course. As of that date any possible immediate realization to apply on the notes would have had to be a resort to the undistributed shares pledged. Burroughs stock was then barely above $8.00 per share. By no proper method of calculation were the notes in question the equivalent of $124,917.40 in cash.

In handling the assets of the Ehrhardt D. Franz estate, the Sophie Franz trust, the Sophie Franz estate and other fiduciary monies it was the practice of Buder & Buder to deposit and carry (or commingle) those monies held in such fiduciary capacities in a common account with other monies of the Buder & Buder law firm. However, the office kept separate ledger sheets showing the detail of credits and debits and the balance due each such client, fiduciary and other person. G. A. Buder had also opened a separate bank account for the Sophie Franz estate. The method of transfer of funds, if any were transferred, from one acount to the other does not clearly appear.

In 1939 G. A. Buder filed his executor's thirteenth settlement of the Sophie Franz estate in the Probate Court. It appears from the summary thereof that he then [570] had $181,922.76 in cash and collateral loans of $40,500.00; and that the assets of that estate then totaled $1,610,128.81.

On April 18, 1941, G. A. Buder, as such executor, filed his fourteenth settlement. The summary thereof showed he then had in cash $87,639.06 and collateral loans of $165,414.70, as property of the Sophie Franz estate. Included in the collateral loans total was an item marked, "Loans of G. A. Franz, $124,914.70". All assets totaled $1,619,085.15. The cash balance difference in the two settlements is explained by other transactions not of importance here. This fourteenth settlement was approved by the Probate Court on July 17, 1941.

The fifteenth settlement filed by G. A. Buder as executor on October 19, 1942 carried forward the collateral loan item of $124,914.70 as, "G. A. Franz, collateral with Buder and Buder, $124,914.70". This settlement was approved November 10, 1943.

On March 23, 1943, Johanna Fiske and certain other legatees of Sophie's estate filed in Probate Court a motion alleging that G. A. Buder, as executor, had attempted to purchase the G. A. Franz notes from himself with Sophie Franz estate funds and prayed an order on the executor to give bond. In July, 1943 that motion was dismissed without prejudice but of its own motion the Probate Court ordered the executor to give a bond of $100,000, and to submit the estate's assets for inspection.

On October 11, 1943 G. A. Buder filed his sixteenth settlement. The item of the G. A. Franz notes of $124,914.70 does not appear therein. The summary shows collateral loans then reduced to $40,500 (the 1939 amount), and an increase in the treasury bond account of $124,914.70. The Probate Court had made no order whatever per-

mitting the G. A. Franz notes to be purchased with Sophie Franz estate funds, nor authorizing respondent G. A. Buder to place the notes in the estate, or to withdraw or decrease cash. After objections had been filed the Franz notes were removed from the face of the settlements and United States bonds were shown in the record of the estate assets. The record further shows that the executor drew his own personal checks to himself as executor and deposited such checks in the account of G. A. Buder, Executor of Sophie Franz. He then drew five checks against that account, each for $25,000 and purchased United States bonds of $125,000 face value, which bonds were placed to the credit of the estate and shown as estate assets. The above facts respecting the administration matter are undisputed. But the explanation of G. A. Buder is important.

Respondent G. A. Buder testified that the $181,922.76 of cash in the firm account to the estate's credit was not earning any interest lying on deposit in the bank; that under a former agreement between the trustees, Sophie and the remaindermen, the latter could and had borrowed estate funds at two per cent; that the five G. A. Franz notes bore six per cent interest; that he felt the G. A. Franz estate should not be compelled to pay six per cent interest on these notes when other remaindermen borrowed from the estate at two per cent; that he turned the notes over to Sophie's estate as a character of voluntary collateral intending thereby to permit Sophie's estate to earn two per cent on the face of the notes, intending that Buder & Buder would therefore charge the G. A. Franz estate only two per cent on the notes and that Buder & Buder would forgive the other two per cent of the interest. He testified he did not take $124,914.70, or any sum, out of the estate's funds and the ledger sheets of the Sophie Franz estate account show no such deduction was made. He contends it was only an accounting or bookkeeping transaction.

On April 15, 1941 G. A. Buder made a memo in his own handwriting as follows: "4-15-41. Memo. Please hold Coll. notes on Est. G. A. F. Deceased to extent of about $125M to be deposited by me as voluntary collateral or security pending payment or distbn.-List attached G. B." Miss McCoy, his secretary, thereafter typed the memo and G. A. Buder signed it. Subsequently the memo was attached to the notes and they were placed in safe deposit. The five notes of G. A. Franz [571] were never endorsed by the payees. There was no physical appropriation of the funds. No actual transfer of funds was made. The transaction was an open one.

We first consider the administration matter. It is difficult to believe this transaction upon the part of any lawyer. Respondent G. A. Buder was first unmindful of that portion of the Code of Legal Ethics, embodied in our Rule 4.11, and providing: "The lawyer should refrain from any action whereby for his personal benefits or gain he abuses or takes advantage of the confidence reposed in him by his

client. Money of the client, or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him." See also, Cornet v. Cornet, 269 Mo. 298, 190 S. W. 333, 343.

The facts are undisputed that while acting as a fiduciary G. A. Buder entered upon his executor's settlement a transaction which, upon its face, appeared to benefit him and damage his cestuis. The legatees were justified in questioning it and in filing their motion. Had the estate's money not been carried in the Buder & Buder bank account perhaps this unfortunate transaction would not have occurred. Informants contend that by the showing upon the face of the summary of the fourteenth settlement, i. e., the reduction of the cash balance shown to be in the estate funds, the appearance thereon of the G. A. Franz notes and, the increase of collateral loans in the amount of $124,914.70; and by the further fact that the new money to purchase the government bonds came from G. A. Buder's personal account; they made a prima facie showing as to this matter. Their contention is not without merit. Informants further insist that it was highly improper for G. A. Buder, without any authority of the Probate Court, to show his own property in the estate assets and to deduct a credit upon the face of the settlement. That should never be done. The situation presented by these facts is fraught with temptation and danger for attorneys in fiduciary capacities. Respondents' action cannot be too strongly condemned. Cornet v. Cornet, supra, Garesche v. Levering Inv. Co., 146 Mo. 436, 48 S. W. 653; 46 L. R. A. 232.

The fiduciary relationship of executor and legatees connotes trust and confidence. It contemplates good faith in all transactions rather than mere naked legal obligation. It comprehends integrity, loyalty, fidelity and trustworthiness more than it relates to credit or ability. This relationship need not be based upon some technical relation created or defined in law but exists where a special confidence has been reposed in one who in equity and good conscience is bound to act not only in good faith but also with utmost fidelity to the interests of those reposing such special confidence. Of necessity it must comprehend the safekeeping and separate holding of all monies received which the fiduciary is in law and good conscience bound to pay over to those for whom he is acting. Regardless of how good the intention or how safe in fact the transaction, a lawyer fiduciary must avoid even the appearance of irregularity or any variance whatever from the established course. Garesche v. Levering Inv. Co., supra, Cornet v. Cornet, supra.

To characterize this particular transaction as most unwise is to draw over it the mantle of charity with understatement. But there are many facts and circumstances of record which we feel justify the conclusion we have reached as to Count VII.

'Without pausing to here analyze the many possible motives behind this transaction (and many motives have been suggested to us by counsel for G. A. Buder and for Informants) we must decline to find from this record that respondent G. A. Buder did "*remove* from the assets of said estate, so held by him as executor money . . . in the sum of $124,914.70 (or any other sum) and *substitute* in lieu thereof, allowed claims due . . . Buder and Buder . . . which . . . had practically no value". From the very openness of the transaction it would be difficult to believe that any such intention ever existed. These facts however are not denied. Respondents' explanation is [572] not so contrary to human probability as that we would be warranted in rejecting it in toto. We accept G. A. Buder's explanation that it was an accounting transaction. Portions of his explanation is supported by documentary evidence. No debit of $124,914.70 appears on the estate ledger sheet. The G. A. Franz notes were never endorsed by payees. Of course, G. A. Buder was aware that his estate settlements would be public records open to inspection by the legatees and their then counsel.

When we consider all the circumstances of this matter in the light of the background of respondent and his evidence of prior good reputation; when we further consider that "where one of two views are open, . . . the one noble and the other ignoble, courts of justice out of tenderness to humanity will not belittle mankind by taking the ignoble rather than the noble view", we are constrained to dismiss Count VII of the information with this admonition and reprimand. That will be done.

THE TRUSTEES COMMISSION MATTER. We now return to a consideration of the above noted trustees commission matter. We agree that it is the general rule that trustees are always entitled to reasonable compensation. That is true even though the basis for computing such compensation, as is the case here, is not set out in the trust instrument itself. We also agree that conscionable trustees' commissions may be a proper subject matter of a binding contract between the beneficiaries on the one hand, and the trustees of a trust upon the other.

We cannot agree with respondents' next contention that a contract with the remaindermen resulted from the May, 1909 meeting at Las Vegas. Each respondent largely premises his position in this Court upon an assumption that the record now before us is sufficient to establish such a contract. Much space in the brief of each respondent is devoted to that proposition. We have carefully analyzed and considered all the testimony. At most the Las Vagas meeting produced no more than a sort of tacit assumption by all present (and three of the Franz remaindermen did not attend at all) that the trustees would be paid five per cent on the *then* (1909) value of the assets. In May, 1909, it was not contemplated nor even dreamed by any one that the

4200 shares of Burroughs then in the trust estate would eventually "mushroom" to 282,500 shares of a value of about $25,000,000. It was likewise not then settled, nor was the question even considered or discussed, that stock dividends would be held not income but corpus. In 1909 neither the trustees nor the remaindermen could have known enough about the long range picture to have made a contract. The written minutes of the 1909 meeting are in evidence. There was no agreement between the remaindermen and the trustees as to any such commissions as trustees later claimed against the remainder interests. We do not find any testimony anywhere in the record which would warrant us in holding that the contract which respondents now contend was entered into in 1909 in Las Vegas, was in fact ever agreed to between the trustees and remaindermen.

Respondents contend that the stock rights distribution agreement of January 7, 1920 should be construed as binding the remaindermen to thereafter surrender five per cent of each remainder interest as trustees' commissions. It cannot be so construed. It was an independent agreement covering only an independent matter. In an attorney's dealing with his cestuis the policy of the law considers it to be wholly inconsistent with the basic principles entering into that fiduciary relationship to torture independent collateral agreements or mere incidents of the relationship into either foundation or leverage for the attorney's financial gain. Rather than the contrary, it is a lawyer's duty to respect and defend the integrity of the cestuis' financial interests. Supreme Court Rule 4.15. The contention must be ruled against respondents.

It is next contended that the trustees "were entitled under the law to compensation for services based upon the entire trust property; and each interest in the trust property (including each remainder interest) . . . was chargeable with its proportion of the total compensation of the [573] trustees, in this instance with five per cent of the value of each remainder interest". This brings us into the heart of this controversy.

In Fiske v. Buder, 125 Fed. (2d) 841 (1942), an opinion by the 8th Circuit Court of Appeals upon the instant facts, that court unanimously held contrary to respondents last above stated contention. Respondents seek to minimize the force of that case. But for reasons therein clearly stated we here adopt the reasoning and conclusions stated in that opinion. In 1927 in Hayes v. St. Louis Union Trust Co., supra, we settled that stock dividends were corpus. But after our decision in the Hayes case respondents took a contrary position with their remaindermen clients, particularly at the Chase Hotel meeting, and thereafter. They also took contrary action. In 1928 in Buder v. Franz, 27 Fed. (2d) 101, and in which case G. A. Buder was a party and wherein he was represented by these respondents as counsel, Judge Stone's opinion specifically called respondents' attention to.

our ruling in the Hayes case, and upon the facts then before that court again put the entire matter at rest. That case determined many issues respecting these facts which it is unnecessary to re-examine here, or restate herein. The record then before that court, and it is now before us, fully warranted the findings and conclusions of that court in that case.

As evidence of Sophie's intention, the trust instrument gave trustees the right "to expend, disburse, retain, and pay out of said Trust Estate and funds, any and all assessments, charges and taxes . . . attorneys' fees, outlays, compensation, charges and costs of administration, necessary, incident or essential to and for the care, protection, preservation, administration, management and distribution of the assets hereby conveyed or hereafter acquired . . . ", etc. We find no other reference in that instrument to any compensation to trustees.

In the absence of any express provision in the trust instrument fixing the trustees' fees or providing any basis for computing the same, and in the further absence of any later contract upon that matter, it is the general rule in Missouri that trustees' commissions are based upon the amount of the yearly income received and paid out by them. Kilpatrick v. Robert, 278 Mo. 257, 212 S. W. 884, Cornet v. Cornet, supra, In re Estate of Mary C. Mays, 197 Mo. App. 555, 196 S. W. 1039, Fiske v. Buder, 125 Fed. (2d) 841, 847. See also, 2 Scott on Trusts § 233.3, page 1269, 2 Perry on Trusts, (7th Ed.) § 919, Bridgeport-City Trust Co. v. First National Bank & Trust Co., 124 Conn. 472, 200 Atl. 809, 117 A. L. R. 1148, 1154, and cases there cited. In the absence of a statute fixing the compensation of trustees (Missouri has no such statute) the courts always allow trustees reasonable compensation, due regard being had for the character of the services rendered. Absent a contract and absent a provision in the trust instrument fixing the basis for computing trustees' commissions, the allowance as a trustees' commission of a portion of corpus upon final distribution to the beneficiaries (or remaindermen) does not go as a matter of right but is a matter wholly within the discretion of the court. There could be circumstances, of course, of unusual or extraordinary character in the matter of the services rendered which would justify a court in departing from the general practice of allowing trustees' commissions only out of the yearly income received and disbursed. That, however, is a question for the court to determine in each such case before it. See cases last above cited.

As supporting their contention respondents rely upon such cases as Loud v. St. Louis Union Trust Co., 313 Mo. 552, 281 S. W. 744, In re McKinney's Estate, 351 Mo. 718, 173 S. W. (2d) 898, Ladd v. Pigott, 215 Mo. 361, 114 S. W. 984, and Estey v. Commerce Trust Co., 333 Mo. 977, 64 S. W. (2d) 608. All cited cases and texts have been carefully examined and are distinguishable. Space forbids a full dis-

cussion. In the Loud case, there here for the second time, and then upon exceptions to the trustee's accounting after the purported trust theretofore had been held void ab initio, the trustee prayed a further trustee's allowance of $57,162.43. Upon that claim the Chancellor had allowed $22,000, but neither the trial court nor this Court directed that any particular amount of that allowance be charged against either corpus or income. There was no issue in [574] that case as to whether corpus or income should pay the allowance, or whether it be pro rated. It does not appear how it was finally ordered to be charged. Nothing in that case supports respondents' contention. In the McKinney case the will creating the trust provided the method of computing the amount of trustees' commissions. In the Ladd case there was an express contract between a court appointed trustee and the beneficiaries of the trust. The Estey case concerned executors' commissions, which are fixed by statute, and merely recognized the almost universal rule that expenditures should be charged against the estate benefitted. These cases simply do not support respondents' contention. The Missouri rule is as we have above stated it.

Before Judge Faris, upon the matter of the exceptions of the 3 1/3 remainder interests to the allowance of trusteees' commissions as against the remainder interests, respondents there conceded the bare bones of the law to be "according to the contentions of the exceptors", and against such allowance and charge as against the remainder interests. Respondents there relied, however, upon a "species of estoppel partly resting in former recognition of the trust and partly upon the request of practically all of the beneficiaries". The estoppel was denied. The trustees' later plea of laches was likewise adversely ruled in 125 Fed. (2d) 841.

As respects the remaindermen, a life tenant stands in the shoes of a quasi-trustee liable for waste. Buder v. Franz, 27 Fed. (2d) 101, 114. It is clear that under the circumstances of record here the commissions of the trustees were lawfully chargeable only against the life tenants' income from the trust property. The trustees' commissions were charges created by the life tenant. The trustees did not create or enhance or preserve the remainder estates. They had nothing to do with those remainder estates except as mere trustees to receive and to hold the stock dividends (the certificates for the shares) and to receive dividends thereon. Having done nothing more their commissions could not lawfully be charges upon the remainder estates other than by contract. There was no such contract.

Respondents next contend that in seeking and securing the allowance of trustees' commissions against the remainder interests there was no representation of conflicting interests. Respondents assert that to be true because remaindermen knew they were counsel for trustees, knew they were seeking to collect trustees' commissions from the remainder interests, and, as counsel for both remaindermen and

trustees they made full disclosure and that nothing was withheld from remaindermen which might have influenced remaindermen's selection of other counsel.

The policy of the law, the rules of this Court; the Canon of Ethics and the adjudicated cases have long held that a lawyer can have but one client in any given matter. Not even the most versatile lawyer "can serve two masters". He cannot represent interests that are or may be conflicting except by express consent of all concerned given after full disclosure of all facts. The law abhors a breach of fidelity to the client's interest. Hoffman v. Hogan, 345 Mo. 903, 137 S. W. (2d) 441, 446, Moffett Bros. Partnership Estate v. Moffett, 345 Mo. 741, 137 S. W. (2d) 507, 511, Rochester v. Gonterman, (Mo.) 49 S. W. (2d) 71, National Hollow Brake Beam Co. v. Bakewell, 224 Mo. 203, 123 S. W. 561, 567, In re Pfiffner's Guardianship, (Mo. App.) 194 S. W. (2d) 233, In re Conrad, 340 Mo. 582, 105 S. W. (2d) 1, Supreme Court Rule 4.06; Fiske v. Buder, 125 Fed. (2d) 841.

It matters not that one of the two interests so represented by the lawyer in the given matter may be his own interest. Lawyers always owe their clients the very highest duty to fully inform them of all rights and interests, of all possibilities of conflicting financial interests, of all pertinent rules of law applicable to the subject matter of the action and of the nature and effect of the transaction itself in order that the clients, should they desire or need to do so, may be enabled to deal with their lawyers at arms length, or secure other counsel. For apparent reasons of public policy, for the maintenance of public confidence in the bar and the courts, and based upon some recognition of human frailties and some knowledge of the motives which inspire the actions of men, it is also the further policy [575] of the law that if any lawyer in a given matter has any personal financial interest therein so that to contend for his client's welfare is to contend against his own financial interest, or contra, if to contend for his own financial interest is to contend against his client's financial interest and welfare, there is (if possible) an even greater duty of full disclosure. We further hold that for reasons above stated, to preserve the orderly administration of justice and "to preclude the honest practitioner from putting himself in a position where he may be required to choose between . . . his own interests and those of his client" an attorney may not by an employment place himself where he could contend for his own and against his client's financial interest and welfare. If an attorney should do that he would bring the courts and his profession into disrepute. See, 7 C. J. S. Attorney and Client § 47, p. 824, Gillette v. Newhouse Realty Co., 75 Utah 13, 282 Pac. 776, Morris v. Glaser, 106 N. J. Eq. 570, 151 Atl. 760, Hunter v. Troup, 315 Ill. 293, 146 N. E. 321. The fiduciary relationship of lawyer and client demands no less. It must exact no less. But under the circumstances now of record before us did respondents even so

much as accord their remaindermen clients that candor, fairness and full disclosure which the law demanded?

From 1926 to 1935 respondents represented the 6⅔ remainder interests. During that entire period respondents claimed those trustees' commissions against the remainder interests and advised those clients their interests were subject to those payments. By advice, by action, by pleadings filed in court upon behalf of those clients respondents steadily sought to extinguish their clients' interests entirely and to merge the remainder interests into Sophie's life estate. G. A. Buder testified that such was his purpose. That purpose was blocked by the decision of the court reported in 27 Fed. (2d) 101. Only because of the confidence reposed in them by their clients were respondents in a position to make the effort to extinguish those estates. Respondents have sought to excuse that action by pointing out that those answers were filed in Buder v. Franz, 27 Fed. (2d) 101, prior to our 1927 decision in the Hayes case. Prior to the Hayes case decision there could have been an honest question in respondents' minds as to whether stock dividends were corpus or income.

But even after the Hayes case decision respondents continued to claim and acted to secure the allowance of commissions against the remainder estates. After the Hayes case decision (and respondents admit they knew of that decision), there could have been no excuse whatever for respondents' further actions or contentions to the contrary.

We find that we are unable to escape the conclusion that at the Chase Hotel meeting in 1930, that in the filing in court of the petition there signed by their remaindermen clients, that in securing the allowances made by Judge Faris of trustees' fees against the remainder interests of their clients, that in the filing in May, 1931, in the Sophie Franz estate in the Probate Court of the trustees' claim for $810,001.22 for commissions from the remainder interests, the respondents in fact were representing the trustees to the financial detriment of their remaindermen clients. The financial interests of G. A. Buder as a trustee and the financial interest of Buder & Buder as counsel for the trustees was in direct conflict with the fiduciary duty of Buder & Buder as counsel for the remaindermen. By the filing of the Probate Court claim respondents confessed their doubt that the District Court had any right to allow commissions as against the remainder interests.

This voluminous record and the exhibits have been carefully examined and the conclusion is irresistible that these remaindermen trusted their counsel, and relied and acted upon their advice. But respondents did not even advise the remaindermen that in the proceeding before Judge Faris, they had a legal right to contest the trustees' claims for commissions as against the remainder interests. Nor were the remaindermen advised that the law did not authorize

any claim by the trustees against the remainder interests for commissions. That, however, is but a small part of the picture showing respondents in fact were representing the trustees instead of their remaindermen clients.

[576] Thus it was that in the proceeding before Judge Faris respondents, in effect, secured judgment for the trustees against their own clients (the 6⅔ remainder interests) and, as respondents were counsel for those remaindermen no exceptions were filed to those allowances. Of course, no appeal was taken.

After Judge Faris' oral opinion and decree no lawyer could say (and respondents will not be heard to contend) that the liability of the remainder interests for trustees' commissions was not doubtful. Respondents sent their clients a copy of Judge Faris' opinion. There was time to do so, but respondents did not advise their remaindermen clients that other counsel be secured while there was yet time in which such remaindermen could file exceptions and take an appeal.

At the bar of this Court respondents have had a long and successful career. Before Informants, before the Special Commissioner and in this Court the respondents have been accorded every right and every courtesy. They have been patiently heard. This record has been carefully examined. To all of that respondents are indeed entitled as of course. Each respondent has testified at great length and with much latitude. Each has been ably represented by eminent counsel. Persons of high business and professional standing testified to respondents' prior good professional reputation and to their great learning. There is little dispute in the facts before us except as to what occurred at the Chase Hotel conference in 1930. In the consideration of this case ours has been an unpleasant responsibility. However, this Court can but face its duty and reach its conclusions upon the facts made by the acting parties and brought here by their counsel.

Under these facts and circumstances, from the greater weight of the evidence and under the applicable principles, we can reach but one conclusion. We rule that, omitting to use that fairness and full disclosure which the law, our Rule 4.06, good conscience and the fiduciary relationship of attorney and client have ever demanded, the respondents in the matter now before us represented conflicting interests, one of which such interests was the financial interest of respondents. In so doing the respondents violated their legal and ethical duty to their clients which, as attorneys-at-law, they owed to those clients. Respondents are therefore guilty of professional misconduct as charged in Counts I, III and IV of the information. Respondent G. A. Buder is also found and declared to be guilty as charged in Count II of the information. All exceptions filed as to Counts I, II, III and IV are overruled. As hereinabove noted Counts V and VI of the information are hereby dismissed. With the reprimand above noted Count VII of the information is hereby dismissed.

It will therefore be the order and judgment of the Court that the separate licenses of the respondents, G. A. Buder and Oscar E. Buder, to practice law in the State of Missouri, shall be suspended for a period of one year from the effective date of the judgment herein and until payment has been made of the costs of this proceding. It is so ordered. All concur.

PER CURIAM:—Variously denominated motions have been filed by respondents. Each respondent has filed a motion for rehearing and to modify our opinion previously filed. Suggestions in support of the various motions have been filed. Among other things, respondents direct our attention particularly and ask re-examination of the letter dated September 16, 1931, from an officer of Security-First National Bank of Los Angeles and addressed to Mississippi Valley Trust Company of St. Louis. We have re-examined and carefully considered that letter and all the other matters set out in the various motions and in all suggestions filed.

After full and careful consideration there appears no reason whatever why we should extend this opinion with a detailed discussion of the letter mentioned above, or of any of the other matters suggested by respondents. We find nothing which would justify setting aside our judgment or granting a rehearing or modification.

In disposing of the charges of this information we feel that we were lenient with respondents and that we considered the unusual [577] circumstances of the age and length of practice of each respondent

All matters presented having been fully considered, all motions filed to set aside our order and judgment, for rehearing, for new trial and to modify our opinion are denied and overruled. It is so ordered.