Flora E. MORRISON, Plaintiff-Appellant,

v.

William J. ASHER and Walter Asher, Trustees under the Will of J. M. Asher, Deceased, Defendants-Respondents.

No. 8139.

Springfield Court of Appeals.

Missouri.

Nov. 1, 1962.

Weldon W. Moore, Rolla, for plaintiff-appellant.

Eugene E. Northern, Breuer, Northern & Crow, Rolla, for defendants-respondents.

RUARK, Presiding Judge.

This is an appeal from the judgment of the circuit court approving a trustees' report and denying plaintiff's petition for removal of said trustees. Such facts as we are able to glean from the transcript are as follows:

About 1949 J. M. Asher departed this life leaving a widow, Sarah, and four children, William, Walter, Floyd and Flora. His last will and testament was admitted to probate in Phelps County. The pertinent portions of said will are as follows:

"SECOND:

"I give, devise and bequeath to my son, Walter Asher, and to my son Wm. J. Asher, trustees of all my property that I may die seized of, be it real, personal or mixed and wheresoever located or situated, to have and to hold as such trustees for the use and bene-

fit of my wife, Sarah E. Asher, and I direct that said property shall be invested and the income from said investment be paid to my said wife, Sarah E. Asher, for and during her natural life and I direct that she shall be allowed to keep the home place where we now reside so long as she desires to do so. I further direct that in case it becomes necessary for my said trustees to do so that they shall have full power and authority to sell and convert any or all of my said property including real estate into cash and to pay to my said wife for her support and maintenance whatever sum or sums may be necessary for her care, support and comfort so long as she shall live and at her death, whatever shall be left remaining, I direct that it shall be divided equally among my four children to-wit: Walter Asher, William J. Asher, Flora E. Morrison and Henry Floyd Asher, share and share alike, and I further direct that if said property shall not have been converted into cash at the time of the death of my said wife, Sarah E. Asher, and after her death if said property cannot be divided equally in kind, then I give to my said trustees full power and authority to sell and convert said property into cash to the to the [sic] best advantage for my said estate and the proceeds to be divided among my said four children above named, share and share alike, and to their heirs and assigns forever."

Walter and William were appointed executors. Administration was had. Whether the widow's allowances provided by statute at that time were made we do not know. On May 27, 1953, William and Walter as trustees gave receipt to themselves as executors for money and property in the total amount of $19,822.68. This consisted of:

| | |
|---|---|
| "Balance" of real estate "per inventory" | $10,750.00; |
| Cash | 872.00; |
| Household goods | 150.00; |

and certain notes as follows:

| | | |
|---|---|---|
| Walter Asher | $2,697.90, | interest 4% due from 9/17/48; |
| W. J. Asher | 3,149.07, | interest 4% due from 9/14/48; |
| W. J. Asher | 50.00, | no interest; |
| W. J. Asher | 60.00, | no interest; |
| Floyd Asher | 2,045.32, | interest 4% due from 12/1/52; |
| Flora Morrison | 618.33, | interest 4% due from 4/1/52. |

The real estate mentioned in the inventory was located on the outskirts of the City of Rolla, and at some time after the settlor's death its value was increased considerably because of a change in the routing of a highway. We find nothing in the record to indicate its value was increased by any activity of the trustees.

At some time prior to December 5, 1957, Flora filed suit in the Circuit Court of Phelps County praying for an order requiring the trustees to give bond. On the above date, the two trustees and their sister, Flora, entered into what is entitled a "memorandum agreement." This agreement recited the fact that such suit had been filed and then provided that "in consideration of the mutual covenants between the parties" it is agreed: (1) The trustees, Walter and William, would, on or before January 1, 1958, furnish to Flora a detailed account in writing of their management of the trust estate from date of final settlement in probate court to and including the year 1956. (2) The trustees would thereafter, com-

mencing with the year 1957, and on or before March 1 of each year, and for so long as said trust continued, furnish to Flora a detailed written account of their management of the trust estate, said written report to be mailed to a specifically stated address. (3) Flora would dismiss without prejudice her suit to require the trustees to provide for security. (4) Flora agreed to join in a deed in which the trustees proposed to sell a certain portion of the trust land (the "Null" tract hereinafter mentioned) for a price of not less than $15,000. This instrument shows the signatures and acknowledgement of Flora and her husband and the signatures and acknowledgement of William and Walter, the two trustees.

In 1961, plaintiff Flora filed the instant suit. The petition recites the facts of death and testacy of J. M. Asher, the final settlement in probate court, the taking over by the trustees, and the fact that Sarah E. Asher, the widow and primary beneficiary of the trust, is still living. It then alleges that the present value of the estate is unknown, that petitioner has no knowledge or information as to the manner in which the trust estate is being handled, and that the trustees have sold some of the real estate and made loans to themselves in controversion of the purposes of the trust. It then relates the fact of the filing of the previous suit and the subsequent "memorandum agreement" in respect to annual accounting hereinbefore mentioned and alleges that the trustees have failed and refused to make such accounting for all years after 1957.

For answer to plaintiff's amended petition, the defendant trustees deny that plaintiff has no knowledge as to how the estate is being handled and state that she has been repeatedly advised that the records of all transactions are available to her and that she has at all times been kept informed. Defendants further plead that they have offered to make loans of cash from the trust to plaintiff on the same terms they have made to themselves, but that on each loan they have required security, and that the plaintiff requested that she be permitted to borrow funds in equal amount as the trustees but that she refused to give security therefor. The trustees further plead that they at time of filing answer had on deposit the sum of $12,000 available for the care of the widow, Sarah, the beneficiary of said trust. Further in said answer they *deny the execution of the memorandum agreement hereinbefore mentioned.*

At the trial of the cause, plaintiff called the two trustees to the stand as witnesses and the defendants in turn called Flora. These were the only witnesses.

William on being presented with the "memorandum agreement" admitted his signature and his brother's signature thereon, but stated that he did not remember any such agreement. Walter also admitted his signature but said he had no memory or record of such agreement and that his signature "could be easily copied." We note further that the *acknowledgement* of William and Walter Asher to this memorandum agreement was taken by a member of the firm of lawyers which prepared the answer *denying the execution of such agreement.* We would not insinuate that the trustees might not have known that Flora had, or had procured, a copy of this agreement and therefore felt safe in denying its very existence. But we do suggest that the ignorance and complete lack of recollection of such trustees in respect to this agreement concerning their accounting obligations have displayed such faulty and failing memories which should be considered in determining whether they are capable of continuing in their duties; which necessarily must involve memory and recollection, investments, obligations, and other matters pertaining to the proper management of the trust.

The trustees acknowledge that they made no accounting or report to any court since the beginning of their trusteeship (until after trial of this case). They do say they made an annual statement or accounting, such being "strictly an expenditure and receipts balance sheet" which did not show

the notes; but to whom, or for what purposes, or in what detail, we are unable to ascertain. Apparently they made one accounting (1957) to Flora Morrison, but they agree that they have made none to her since. One trustee stated that they had made a written accounting to a Mr. Donnelly, but the record is silent as to who, this Mr. Donnelly was, whether he was a tax accountant, a friend, or an attorney for Flora in the first suit, which resulted in the 1957 accounting. It is evident that no regular annual reports or accounts have been made, either to any court, or to any beneficiary of the trust except for the one report made to Flora after, or in connection with, the 1957 suit and agreement. The trustees do say that they invited Flora to come up and look over the records and notes, but she did not do so. She says she would not have understood them had she done so. There is evidence of hostility between at least one of the trustees and Flora. The trustees say that this is because she wanted to borrow money without security (the same as they had been doing?) and they refused because she would not provide security. We will not go into all the details, but it is obvious that there was considerable hostility, whatever the cause. The two suits reflect that.

In the latter part of 1957, the trustees sold a portion of the land (referred to as the "Null sale") for $15,000. Shortly thereafter, trustee William borrowed from the estate the additional sum of $6500 at 4% interest. This appears to have been upon his own personal note. There is some rather garbled explanation (?) of this in the record, but in so far as we can find, this note was not secured. His wife did not sign the note and his own property was held by the entirety. Sometime after the Null sale, the exact date of which we are not sure, trustee Walter borrowed the additional sum of $6,000 at 4% interest. He says he and his wife gave a deed of trust to secure this.

In September, 1961, the trustees sold another portion of the property (that which is referred to as the "St. Louis sale") for the price of $20,000. Flora was not consulted about this transaction. Shortly after this sale, trustee William again borrowed a total of $2,000 (in three separate borrowings) in additional funds from the estate. This also was represented by personal, unsecured notes bearing interest at 4%. Trustee Walter paid up the interest then due on his $6500 note and borrowed an additional sum making his total trust borrowings (to distinguish from notes which the trustees already owed the estate at time of final settlement in probate court) $10,500. This was evidenced by note in such amount bearing 4% interest, and Walter says it was secured by a deed of trust on his property.

Both of the real estate sales above referred to were made without first applying to a court of equity for direction or authority to do so, or for approval thereafter.

William testified that at the time of the first sale the trustees had $239.00 in the bank. Walter testified, however, that the sale would not have been necessary had the children paid in the old notes (notes given prior to trusteeship). He agreed that the St. Louis sale was not necessary to provide care and maintenance for Sarah Asher, the widow and primary beneficiary. The trustees defend such sale, however, on the ground that it was a good business venture. Of this we are not able to judge; the record does not provide adequate facts.

In making the St. Louis sale, the trustees paid a real estate commission in the amount of $1,000. Then they also paid themselves $500 apiece as commission for making such sale. Their services consisted of negotiating through the real estate agent, two short conferences with the purchasers, and having the county surveyor survey the property. There is no contention that this survey was at the personal expense of the trustees. From time to time the trustees charged the trust estate other commissions in varying amounts. As nearly as we can calculate, each of the trustees

charged or received as commissions a total of $1,286.00, or a total for the two of $2,572.00. None of these commissions were submitted to or approved by any court.

During the period commencing with the trust, up to time of trial, the trustees made no effort to collect the principal or interest of any of the notes held by the estate, including their own, and no interest was paid except on the one occasion when Walter's loan from the trustees was raised from $6500 to $10,500, at which time he said he paid up his interest ($660) on the money he borrowed from the estate after beginning of the trusteeship. This is all the interest which was collected.

As to collection of principal, William apparently paid a total of $250 on the *principal* of his 1945 (before trust) note during the trust period, and Walter paid a total of $150 on the *principal* of his 1948 (before trust) note. These personal notes of William and Walter went unrenewed, unsecured, and with no interest paid. The personal notes of Floyd and Flora have interest due from 1952. (They were evidently renewed at that time.) The trustees agreed no effort had been made to collect interest because, "it's largely a case of paying interest to ourselves." In all of the transactions heretofore mentioned, the trustees acted in concert or acquiesced in each other's conduct.

As nearly as we can calculate from the meager showing made, at the time suit was brought to remove the trustees, William and Walter, together, owed the estate the total approximate sum of $26,500 *plus accumulated interest* (at 4%) on all their notes from the date of making same, some as far back as the 1940's (excepting the $660 which we have heretofore mentioned as having been paid up by Walter when he increased his note to $10,500). We have not attempted to calculate the total interest due. And, again as nearly as we can gather from the record, at that time they had as trust assets, exclusive of their own personal (delinquent) notes, approximately the

sum of $12,000 in a bank account "just laying there" (evidently not drawing any interest), notes from other remaindermen in the approximate total sum of $2600 plus interest, plus one remaining tract of real estate, which so far as we can find has never been appraised except in the general appraisement of real estate made in the probate administration in about or prior to 1952.

On March 14, 1962, after having heard the evidence we have heretofore attempted to collate, the trial court entered its order taking the case under advisement until March 24 "on condition that trust estate be brought up to currency with respect to payment of all back interest and currency with respect to date of outstanding notes and currency with respect to good and sufficient security for all indebtedness to the trust estate. This accounting to be filed herein and a copy presented to attorney for plaintiff on or before March 23, 1962."

On March 23, 1962, the trustees filed their "report accounting for all Income and Expenditures since their last report dated December 31, 1961." (We have already indicated that the evidence does not show any previous report and accounting, or approval of any character of report.) In this after-trial report they show collections of interest on all the notes, including their own, and their report shows a note inventory as follows:

Floyd, 4%, 4/1/52 (a renewal), principal sum due $2,045.32, unsecured;

Flora, 4%, 12/1/52 (a renewal), principal sum due $618.33, unsecured;

Walter, 4%, 5/8/48, principal sum due $3,170.50, unsecured;

William J., 4%, 10/27/45, principal sum due $3,694.41, unsecured;

Walter and wife, 4%, 9/13/61, $10,500.00, secured by deed of trust;

William J. and Mary Asher, 4%, *3/23/62* (after trial of the case), $9,406.28, secured by deed of trust.

The report inventory also includes a tract described as a fractional part of Railroad Lots 97 and 120 with a statement that "No appraisement has been made since the administration of the estate of J. M. Asher, deceased, in 1952."

On March 24, the court by its judgment approved the trustees' report and denied the petition for removal of the trustees, but did order them to file annual reports.

We think the bare statement of facts above set forth makes it self-evident why we cannot agree with the judgment of the trial court.

■ As we view it, J. M. Asher made this will and created this trust with the intent, first and foremost, of providing for his widow. There does not appear to be any intention on his part to give the two trustees carte blanche in the use and enjoyment of the funds which he (no doubt with Sarah's help) had accumulated, nor did he expect his children to reach with hungry hands for such while his widow still lived. The safety of this trust fund is the "first care of the law." Ford v. Boyd, Mo.App., 298 S.W.2d 501.

■ We have grave doubts as to whether the trustees had authority to make the sales of real estate which they did except by and with court authority, especially the second or "St. Louis" sale, for it is obvious that such was not then "necessary" for the support or maintenance of Sarah. A trustee does not have unlimited authority in disposing of assets or in making investments. He does not have the same freedom with which he might invest his own funds, St. Louis Union Trust Co. v. Toberman, 235 Mo.App. 559, 140 S.W.2d 68, and where the sale of real estate is not expressly or impliedly authorized by the charter instrument, authority of the court should be sought to make such sale. 54 Am.Jur., § 447, p. 354; 90 C.J.S. Trusts § 287, p. 417; Bogert, Trusts and Trustees 2d Ed., § 742, p. 579. However, we do not find it necessary to rule on such question in deciding whether or not the trustees should be removed.

■ A trustee is a fiduciary of the highest order. He is required to observe meticulously the fiduciary relationship, to exercise utmost good faith in handling the funds in his hands, and in all respects to exercise a high standard of conduct and fidelity in respect to administration of his trust. Bogert, Trusts and Trustees 2d Ed., § 543, pp. 473, 474; Bakewell v. Mercantile Trust Co., Mo., 319 S.W.2d 600; White v. Hughes, Mo.App., 88 S.W.2d 268. And in exercising his authority, even though given the widest discretion by the instrument, he is not authorized to dispense with the requirements of care, skill and diversification, Vest v. Bialson, 365 Mo. 1103, 293 S.W.2d 369, 63 A.L.R.2d 504, but is under the duty to exercise the care, skill and diligence which a prudent man would exercise in the management of the funds of others. Restatement, Trusts 2d, § 227; Bogert, Trusts and Trustees 2d Ed., § 639, p. 590. And where the trustee has failed to do what the charter of his powers, the trust instrument, directs him to do, the burden is upon him to show absence of facts which make for bad faith. All doubts will be resolved against him. Bogert, Trusts and Trustees 2d Ed., § 962, p. 11; Scott on Trusts 2d, § 172, p. 919; Kimpton v. Spellman, 351 Mo. 674, 173 S.W. 2d 886; Covey v. Pierce, 229 Mo.App., 424, 82 S.W.2d 592.

■ As we view it, the trustees stood in a fiduciary capacity first to the primary beneficiary, to wit, the widow, Sarah, and secondly to the secondary beneficiaries or remaindermen. See Buder v. Franz (8th Cir.), 27 F.2d 101; In re Buder, 358 Mo. 796, 217 S.W.2d 563. The income from the estate belonged to the widow, Sarah, as *a matter of right*. It was hers to spend or give away as she so chose. We cannot gather from the will any intention on the settlor's part to leave his helpmate dependent on the whims of others for that which was justly hers. She was entitled to have the assets invested at a proper (and secured) rate of interest and to *receive that income*. Beyond that she was entitled to receive whatever was "necessary" for her maintenance from the

corpus assets. The remaindermen were entitled not to have the corpus depleted or endangered to any further extent than became necessary for the support and maintenance of Sarah. We gather from the transcript that various of the children were paid some sums as "keep" for Sarah; also, that the trustees paid for her a hospital bill. (She had been involved in an automobile accident.) These payments must have necessarily come in greater portion from the corpus, because the trustees had pre-empted and were using a goodly portion of the assets and were not even paying the (low) interest for its use.

■■■ A trustee owes the trust his utmost loyalty. He cannot permit himself to be put in a position adverse to his trust or his cestui. Under ordinary circumstances he should not deal with himself as an individual. Restatement, Trusts 2d, § 170(1); Bogert, Trusts and Trustees 2d Ed., § 527, p. 366; 54 Am.Jur., § 314, p. 249, § 315, p. 250; Kimpton v. Spellman, 351 Mo. 674, 173 S.W. 2d 886; Wiegand v. Woerner, 155 Mo.App. 227, 134 S.W. 596; Powers v. Johnson, Mo. App., 306 S.W.2d 616(13); In re Skinner's Estate, 215 Iowa 1021, 247 N.W. 484; Carrier v. Carrier, 226 N.Y. 114, 123 N.E. 135. We think it is manifest that one cannot, at least without specific authority from the trust instrument or without permission from and supervision by a court of equity, borrow from himself as trustee without placing himself in an adverse position which could dilute his loyalty. For instance, the trustee as lender might be tempted to loan funds at a low rate of interest, or without adequate security, or he might be tempted not to require himself as borrower to pay the interest when it was due. The dilution of loyalty is apparent in this case.

■■■ As to commissions, where neither the trust instrument nor statute provides for any certain amount, percentage or method of determining trustees' fees, and there is no agreement in respect to such, it is proper to submit the amount of commissions of the trustees to a court of equity for approval and allowance. Bolles v. Boatmen's Nat. Bank of St. Louis, 363 Mo. 949, 255 S.W.2d 725(18); Commerce Trust Company v. Aylward (8th Cir.), 145 F.2d 113, 115(12). The trustees do not have the legal authority to fix the amount which they shall take for their own services. In re Locarno Building & Loan Ass'n., 127 N.J.Eq. 509, 13 A.2d 791. Also, in ordinary circumstances, and in the absence of direction or authority in the trust instrument, trustees' commissions should be based upon the amount of yearly income received and paid out, and not based upon the handling of the corpus except by and with court approval after a showing of circumstances justifying such. Bogert, Trusts and Trustees 2d Ed., § 975, p. 283; In re Buder, 358 Mo. 796, 217 S.W.2d 563, 573, and cases cited l. c. 573; In re Franz' Estate, 359 Mo. 362, 221 S.W.2d 739, 741, 742; see Fiske v. Buder (8th Cir.), 125 F.2d 841. We look with jaundiced eye upon the act of the trustees in paying themselves a commission, along with one to the real estate broker, for the St. Louis sale. It is a ground for removal of a trustee that he overcharged for his services. Bogert, Trusts and Trustees 2d Ed., § 527, p. 371; Barkley Cemetery Ass'n. v. McCune, 119 Mo.App. 349, 95 S.W. 295. The record does not furnish us enough information to be able to state whether or not the other commissions were justified. It is doubtful if they came from collected income. It is frequently stated that a trustee who breaks faith with his trust may be denied all or part of his compensation for services. Bogert, Trusts and Trustees 2d Ed., § 980, pp. 404, 405; Lipic v. Wheeler, 362 Mo. 499, 242 S.W.2d 43; Wiegand v. Woerner, 155 Mo.App. 227, 134 S.W. 596; Harvey v. Schwettman, Mo.App., 180 S.W. 413; Folk v. Wind, 124 Mo.App. 577, 102 S.W. 1, 3; Sebree v. Rosen, Mo., 349 S.W.2d 865, 890(48).

■■■ Nor do we understand why the trustees have failed to render an annual accounting to any court or to the cestui que trust. A previous suit had brought focus on their duty to do so, and they had signed a written agreement that such would be done.

Two faulty memories are no excuse. The cestui que trust is entitled to a full and accurate record and accounting of the trustees' stewardship. Restatement, Trusts 2d, § 172; 54 Am.Jur., § 497, pp. 396 et seq.; 90 C.J.S. Trusts §§ 377, et seq.

In this case the trustees acted in concert, or at least the acts of one were acquiesced in by the other. Both must bear the responsibility of the acts, or failure to act, of each. Harvey v. Schwettman, Mo. App., 180 S.W. 413; Denny v. Guyton, 331 Mo. 1115, 57 S.W.2d 415(16).

We realize that the power of the court to remove a trustee should be used sparingly and that before it is exercised there should be such misconduct as to evidence want of capacity or fidelity which has, or might likely, put the trust in jeopardy. State ex rel. Caulfield v. Sartorius, 344 Mo. 919, 130 S.W.2d 541; Sternberg v. St. Louis Union Trust Co., D.C., 66 F.Supp. 23; Smith v. Board of Pensions of The Methodist Church, Inc., D.C., 54 F.Supp. 224. We also consider that mere hostility alone toward the cestuis or one of the cestuis is not usually, in and of itself, sufficient ground for removal. Shelton v. McHaney, 343 Mo. 119, 119 S.W.2d 951; Sternberg v. St. Louis Union Trust Co., 8 Cir., 163 F.2d 714. But, hostility coupled with other conduct, such as questionable investments, is ground for removal. Vest v. Bialson, 365 Mo. 1103, 293 S.W.2d 369, 63 A.L.R.2d 504; Gaston v. Hayden, 98 Mo.App. 683, 73 S.W. 938.

Without attempting to go further into detail, we are of the opinion that the trustees do not seem to have a proper conception of their duties under this trust; that they appear to regard the trust assets as their own property; that they have demonstrated a lack of capacity or fidelity for the positions which they hold; and that their continuance in such positions might further corrupt the purposes of the trust and jeopardize its assets. By this statement we do not mean to say, or to imply, that the trustees have been personally dishonest. Their incapacity and infidelity is a legal result, arising no doubt from an inability to comprehend their joint position in fiduciary capacity.

It is our opinion that the judgment of the court in approving the report and refusing to remove the defendants should be reversed. The trustees should be removed and they should be required to render accounting for the whole period of their trusteeship. In such accounting they should be charged with interest on all loans made to themselves during the trust period at the going and market rate of interest for loans of similar character and security at the time such self-loans were made; and they should also be required to prove the basis of charge made for any commission paid unto themselves.

The judgment is reversed with directions to remove the trustees and to appoint a qualified substitute or substitutes, and for further proceedings not inconsistent with this opinion.

STONE and McDOWELL, JJ., concur.